*Decisions will be entered under Rule 155.*

IDEAL BASIC INDUSTRIES, INC., AND SUBSIDIARIES, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11847–78.    Filed February 29, 1984.

---

*Claude M. Maer, Jr., Howard W. Rea, Donald A. Barnes, David M. Ebel, Robert E. Benson, John C. Siegesmund III, Dennis P. Bedell,* and *Robert D. Heyde,* for the petitioners.[*]
*John D. Moats,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in and additions to petitioner's Federal income tax as follows:

| Calendar year | Deficiency | Additions to tax under sec. 6653(a)[1] |
|---|---|---|
| 1971 | $414,016 | 0 |
| 1972 | 275,335 | 0 |
| 1973 | 867,424 | $43,371 |
| 1974 | 579,348 | 28,967 |
| | 2,136,123 | 72,338 |

The deficiencies result primarily from adjustments to petitioner's deductions for percentage depletion with respect to its potash mining operations, with the exception of Issue 7 which relates to petitioner's cement operations.

The issues remaining for decision are as follows: (1) Whether the leaching and crystallization processes by which petitioner produces chemical grade muriate (and some soluble grade muriate in the chemical circuit) are mining processes within the meaning of section 613(c)(4)(D); (2) whether storage of petitioner's muriate products on its mine sites is a mining process or a process necessary or incidental to mining; (3) whether loading for shipment of petitioner's muriate products at its mines is a mining process or a process necessary or incidental to mining; (4) whether the standard grade muriate which petitioner sold to customers at Carlsbad, and muriate which petitioner shipped from Carlsbad, N. Mex., to Dumas and Fort Worth, Tex., for conversion into potassium sulphate are minerals of like kind and grade so that petitioner's actual sales price (f.o.b. Carlsbad) of the former can be used as a

---

[*]Brief amicus curiae was filed by James B. Adams, attorney, on behalf of Duval Corp.

[1]All section references are to the Internal Revenue Code of 1954 as amended. The matter pertaining to the additions to tax has been resolved by the parties and is no longer an issue.

representative market or field price for the latter; (5) whether petitioner's costs of leasing some railcars from an independent leasing company for use by the railroads in transporting muriate for petitioner's customers is a general overhead expense rather than a direct mining or nonmining cost; (6) whether the freight charges which petitioner prepaid to the common carrier railroads for and on behalf of its customers to transport potash from petitioner's mines to its customers in leased cars must be disregarded in a depletion calculation because (a) they are not petitioner's costs, (b) they are incurred after the f.o.b. point of sale, (c) there are other sales that establish a representative market or field price on a first marketable product price, or (d) they qualify as purchased transportation to the customer; and (7) whether petitioner's interest income may be offset against its interest expense for purposes of calculating the net income limitation with respect to petitioner's cement depletion allowance.

The findings of fact and opinion are combined under the headings which describe the issues.

### FINDINGS OF FACT AND OPINION

#### *General*

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference.

Petitioner Ideal Basic Industries, Inc. (Ideal Basic), is a corporation organized and existing under the laws of the State of Colorado. Petitioner and members of its affiliated group filed consolidated Federal income tax returns for the taxable years 1971 through 1974 with the Internal Revenue Service in Ogden, Utah. These returns were filed using the accrual method of accounting. For the sake of simplicity, we shall refer to petitioner in the singular.

Petitioner's Potash Co. of America Division (PCA) is the continuation of a predecessor corporation, Potash Co. of America, which petitioner acquired on December 31, 1967. PCA, previously as predecessor and currently as a division of petitioner, has been mining sylvinite ore and concentrating and producing potassium chloride or KCl, commonly called "muriate of potash" or "muriate," near Carlsbad, N. Mex., since 1935. It has also operated a sylvinite mine and concen-

tration plant at Saskatoon, in the province of Saskatchewan, Canada, since 1963.

## Issue 1. Treatment Processes

The word "potash" is derived from the residues—pot ashes—originally obtained by evaporating, in iron pots, solutions dissolved out of or "leached" from wood ashes. Today, most potash is recovered through shaft mines from deeply buried salt beds deposited as the result of the evaporation of ancient seas dating back to early periods in the earth's geological history.

Potash denotes a chemical combination of the element potassium, an alkali metal, with one or more elements. When used in connection with fertilizers, potash refers to various salts of potassium, including chlorides, sulphates, and carbonates. Potash is also the term applied to the oxide of potassium, $K_2O$, which is an unstable compound not found independently in nature.

In order to use a common unit of measurement for the potassium content of the various salts of potassium used for agricultural purposes, the value of the potash product is normally expressed commercially in terms of the theoretical relative content of $K_2O$ (potassium oxide), or "$K_2O$ equivalent," derived from the potassium content of the particular potash product, thus providing a basis for the comparison of all potash minerals.

In the case of muriate (KCl), the conversion ratio is 100 to 63.171, meaning that the potassium content of 100 pounds of KCl is the same as the potassium content of 63.171 pounds of $K_2O$. Accordingly, chemically pure KCl is said to contain 63.171-percent equivalent $K_2O$. The KCl content of muriate can, therefore, be determined from the equivalent $K_2O$ content by multiplying the equivalent $K_2O$ content by 1.583 (the reciprocal of 0.63171).

Potassium chloride occurs in nature as the mineral sylvite. Minerals are chemical elements or compounds occurring naturally in the earth's crust. When a deposit of minerals is of sufficient abundance to be profitably mined and treated to extract its metallic or nonmetallic components, it is called an ore. The ore petitioner mines in Carlsbad and Saskatoon is sylvinite, interlocked crystals of sylvite (potassium chloride,

muriate, or KCl), and halite (sodium chloride, common salt, or NaCl).

During the years 1971–74, the Carlsbad ore contained roughly 31-percent KCl and 68-percent common salt, as well as clay slime (together with other insolubles) which, because of its nature, highly complicates the treatment of these ores. The worthless material such as clay removed during the extraction is called gangue.

During the years in question, the Canadian ore contained roughly 43-percent KCl, 52-percent common salt, and 5-percent insolubles, and hence required slightly different but substantially similar treatment processes.

The mechanical processes necessary to segregate valuable minerals from gangue are collectively referred to as mineral dressing. Since most ores contain more than one type of mineral, it is necessary to free them from their interlocked state. This is accomplished by various treatment processes which break them down into finer consistencies. The treatment processes fall into two broad categories: the first is crushing and grinding in order to prepare the mineral for "beneficiation"; the second involves breaking down the minerals in order to reject valueless waste and recover the valuable mineral or expose the desired mineral for further treatment. Beneficiation, in general, means increasing the purity of a mineral by separating out the valueless or undesired components using any of various treatment processes. It has been practiced since man first produced copper around 3,000 B.C.

Some minerals such as coal or iron ore are customarily sold in the crude state; in other words, there is a market for them in the crude state. Even for these minerals there may be some sorting, cleaning, or concentrating to eliminate waste rock or dirt, to bring the mineral up to acceptable shipping grade. For other minerals, however, there is no general market for the crude material as it comes from the mine. Often the valuable mineral is so mingled with rock and waste—perhaps minute quantities of the desired mineral are scattered through the rock masses—that a combination of mechanical, chemical, or other processes may be necessary to obtain a mineral product or products for which there is a recognized market. This can involve any of the various methods known as concentration, some of which involve chemical change, but all

of which raise the level of purity of the mined mineral. Some methods are better suited to concentrates that are very fine in consistency, and some by their very nature produce minerals with relatively high degrees of purity.

The most common treatment processes involve concentration by gravity or flotation. In the gravity process, the ore, ground to gravel or sand size, is agitated in water, the heavier mineral particles sink, and the lighter waste rock above is carried off in the flow of water. In the flotation process, the finely ground material, suspended in water, is combined with certain oils and chemical additives, and agitated to form a froth. The metallic particles adhere to bubbles formed by air introduced into the mixture, rise to the surface, and then are skimmed off; the waste rock does not adhere to the bubbles and drops to the bottom.

The methods of concentration used most frequently to recover potassium chloride, or muriate of potash, from the sylvinite ore are froth flotation and crystallization.[2] Crystallization is essentially a purification process. A solid is introduced into a liquid, and once the liquid becomes saturated with the solid, upon cooling, the less soluble substance crystallizes.

In other processes for eliminating waste, the desired metals are dissolved from the ore leaving the waste rock behind; the metals are then removed (precipitated) from the solution chemically or by other means. For example, leaching is generally the removal, extraction, or separation of soluble material from an insoluble one by selective dissolution in a suitable solvent such as water. The solvent is usually recovered by precipitation or other method which, in essence, causes a solid to form out of a solution. Processes such as cyanidation, amalgamation, precipitation, and crystallization are also processes for rejecting waste by separating the valuable mineral from the valueless or other mineral.

After mineral dressing, the next phase during which the impure minerals or concentrates are reduced to metals, refined, alloyed, or made to specifications is called process metallurgy. The processes applied during this phase, such as smelting or electrolytic refining, involve methods using heat or electricity.

---

[2]Bureau of Mines, U.S. Department of Interior, Bulletin 650, Mineral Facts and Problems 1157, 1160 (1970).

PCA produces five different grades and sizes of muriate for sale at its Carlsbad plant: standard, coarse, and granular grade products (in ascending order of particle size), all produced by processes involving flotation, and soluble and chemical grade products, both produced by leaching and crystallization processes. Only the last two processes are at issue in this case.

The Carlsbad products are similar in size and appearance to the corresponding Saskatoon products except that no chemical grade muriate is produced in Saskatoon, and the coarse and granular grade products from Saskatoon are slightly different in color. The Canadian coarse and granular grades contain a substantial proportion of particles which have a dull pinkish brick color because roughly half of such particles are produced by compaction, a process not used in Carlsbad.

The standard, coarse, and granular grades, or "flotation" muriates, are produced in Carlsbad and Saskatoon. During this flotation process, the mineral sylvite, a native potassium chloride, is floated away from the halite, a native sodium chloride (common salt), and clay to produce a purer potassium chloride, or muriate of potash, for agricultural purposes. All three grades of flotation muriate are produced by conditioning the ore with reagents and floating the KCl particles to the top of a brine solution by air bubbles which cling to the reagents which, in turn, cling to the KCl particles. A "reagent," as the term is used here with respect to flotation, is a substance added or applied to another material, such as ore, in order to effect or aid a separation.

In order to facilitate the flotation process, the ore is screened, crushed, scrubbed, deslimed (desliming is the separation of particles of ore associated with clay and other insolubles from other particles generally susceptible to flotation), leached, dewatered, and dried. The screens which receive mine-run ore as it is extracted from the mine are referred to as primary scalping screens. The purpose of the primary screens is to remove material which does not require any further crushing to prepare it for the subsequent treatment processes.

Petitioner's "standard grade product" has been produced by flotation for many years for agricultural uses. Since 1957, PCA has also been successful in the flotation of larger-sized particles of muriate (coarse grade product and granular grade product) by newer and more complex flotation processes using

a somewhat different combination of reagents, principally petroleum-based oil in association with amines (animal or vegetable fats).

Petitioner's flotation muriate (standard, coarse, and granular grades) is guaranteed to have a minimum $K_2O$ content of 60 percent (94.98-percent KCl), and ordinarily has a somewhat higher $K_2O$ content.

After PCA has floated the standard grade muriate in its standard circuit at Carlsbad, it is dried and sent through air sizers to remove smaller muriate particles. The particles are commonly referred to as muriate "fines" and dust. During 1971–74, these muriate fines and dust had an average KCl content of about 94.3-percent or 59.5-percent $K_2O$. In order to be commercially marketable, muriate must have a $K_2O$ content of at least 60 percent. These muriate fines have been produced by mining treatment processes. About 2 percent of the fines and dust used in the chemical circuit are from the soluble circuit. The muriate fines and dust used for the production of soluble muriate are the same as those used for the production of chemical grade muriate.

Soluble grade muriate is produced by leaching or dissolving KCl and some NaCl from fine particles of ore, slimes, and other tramp KCl particles and crystallizing the KCl out of the solution. All muriate is water soluble. It is called soluble grade muriate because the crystallization of muriate from saturated brine substantially eliminates insoluble matter as an incidental result of separating the muriate from the salt, since the insoluble matter (such as the iron and clay which make the flotation products red or pinkish) will not dissolve and, therefore, cannot be crystallized. Soluble grade muriate is guaranteed to have a minimum $K_2O$ content of 62-percent or 98.146-percent KCl and ordinarily has a higher content.

Soluble grade muriate is produced in the chemical circuit by the same processes used in making chemical grade muriate, viz, dissolving or leaching the fines with cold fresh water, conveying the leached fines in a slurry (a mixture of solids and liquids) to a filter and then to the dissolving units and a tray thickener, much like a settling tank. From there, the KCl is crystallized out of the solution. The soluble plant has one crystallization unit with three crystallizers.

The only difference between the production of the soluble grade and chemical grade products in the chemical circuit is that the production of soluble muriate involves fewer product washings and the retention of a greater percentage of the brine discarded from the chemical plant tray thickener. Fewer brine washings result in the retention of more common salt and hence lower KCl content.

The chemical grade product is produced by conveying the fines from the standard circuit into a pump box where cold water is added before the material is pumped into one of the two parallel vertical agitator tanks. About 75 to 90 percent of the sodium chloride (common salt) is taken into solution. The clay and other insolubles are not taken into the solution, and most of the KCl remains in a crystalline state because it is generally insoluble in cold water. The material leaves the leaching box as a slurry consisting of the salt dissolved in the water, part of the KCl that did dissolve, and the remaining KCl that is suspended in the solution along with other insolubles.

The material is then placed on horizontal rotating filters that have a vacuum on the inside. As the material comes in contact with the filter, the solids remain on the outside of the screen, and the brine is pulled through, leaving behind the bulk of the KCl and some insolubles. This solid material is removed from the filters, combined with a different brine, and pumped into the dissolver. The dissolvers are vertical agitating vessels where heat is applied through steam coils to elevate the temperature to about 200 degrees Farenheit. The heat causes the potassium chloride and sodium chloride to go into solution. The insoluble material stays suspended in the brine.

After leaving the dissolvers, the material goes to the chemical plant thickeners where a clear brine overflows the top, and the solids, including clay, settle to the bottom and are drawn off. Flocculent, a reagent that causes the clay to coagulate, is added at this point.

The brine containing the dissolved KCl and common salt is sent to the chemical plant crystallizers, three vertical vessels connected in a series. Reagents are added at this point. Sodium hydroxide is added to adjust the pH of the brine. Sodium

hydrosulphide is added to precipitate out heavy metals such as lead, nickel, and copper in trace amounts.

The pressure in each of the three crystallizers is successively lower, causing more crystals to form. After the material leaves the brine, it is conveyed to "hydroclones" which separate the solids from the brine by means of centrifugal force which also slightly reduces its moisture content. The material is then dried and sent to the warehouse.

The crystalline configuration of PCA's chemical grade and soluble grade muriate is basically the same as the crystalline configuration of the potassium chloride present in the ore as it was mined from the ground. The chemical composition of a KCl crystal in chemical grade muriate is the same as the chemical composition of a KCl crystal in ore extracted from the ground. The main differences between the flotation products and the chemical circuit products are color, size, and KCl content. The flotation products have a KCl content of about 96 percent, the soluble at least 98.146-percent KCl, and chemical 99.9-percent KCl.

The Commissioner, in his notice of deficiency, recomputed petitioner's percentage depletion deduction with respect to its potash operations using the proportionate profits method.

The first issue in this case requires us to decide whether treatment processes used by petitioner in the processing of potassium chloride constitute "mining" within the meaning of section 613 so that gross income attributable to such processes is subject to the allowance for percentage depletion. The resolution of this issue involves the interplay of section 613(c)(4), section 613(c)(5), and the regulations promulgated under these two Code sections.

The parties agree that potash is "not customarily sold in the form of the crude mineral product" and is, therefore, governed by sections 613(c)(4)(D) and 613(c)(5). The resolution of this issue also involves the interpretation of "refining" as used in section 613(c)(5) and in sections 1.613–4(f)(4) and 1.613–4(g)(6)(iii), Income Tax Regs. At issue in particular are the "leaching" and "crystallization" processes used by petitioner to produce two of its five potash products—soluble and chemical grade KCl.

Section 611(a) provides generally that in the case of mines there shall be allowed as a deduction in computing taxable

income a "reasonable allowance for depletion." Under section 613(a), this allowance is prescribed as a specified percentage (14 percent for potash, sec. 613(b)(7)) of the "gross income from the property," not to exceed 50 percent of the taxable income from the property, computed without the allowance.

"Gross income from the property" is defined in section 613(c)(1) as "the gross income from mining." "Mining," in turn, is defined in section 613(c)(2), as amended by section 302(b) of the Public Debt and Tax Rate Extension Act of 1960,[3] (hereinafter the Gore amendment), to include the extraction of ores or minerals from the ground, plus "the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto)."

Section 613(c), prior to its amendment in 1960, defined mining to include not only the extraction of ores or minerals from the ground, "but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable product or products."

*United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960), interpreted this language to mean that the cutoff point for percentage depletion allowance was where the mineral first became "ready for industrial use or consumption." *United States v. Cannelton Sewer Pipe Co., supra* at 86. By the Gore amendment, Congress sought to eliminate the troublesome language, "commercially marketable mineral product," before the Supreme Court in *Cannelton*. It did so by altering the then-existing statutory framework of section 613(c) and omitting the modifying word "ordinary" which preceded "treatment processes." Congress shifted the emphasis away from "marketability" and instead attempted to draw a line between mining and manufacturing by listing those processes it considered part of normal mining operations. Section 613(c)(2) defined "mining" to include "not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining." Section 613(c)(3) provides that "The term 'extraction of the ores or minerals from the ground' includes the extraction by mine owners or operators of ores or minerals from the waste or residue of prior mining." See sec. 1.613–4(i), Income Tax Regs.

---

[3]Public Debt and Tax Rate Extension Act of 1960, Pub. L. 86–564, 74 Stat. 290.

Section 613(c)(4)(D), which is also repeated verbatim in section 1.613–4(f)(2)(i)(d), Income Tax Regs., provides:

(4) TREATMENT PROCESSES CONSIDERED AS MINING.—The following treatment processes * * * shall be considered as mining * * *:

\*      \*      \*      \*      \*      \*      \*

(D) in the case of lead, zinc, copper, gold, silver, uranium, or fluorspar ores, *potash*, and ores or minerals which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, *leaching, crystallization*, precipitation (but not including electrolytic deposition, roasting, thermal or electric smelting, or refining), *or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit;* [Emphasis added.]

The pertinent part of the regulation under this Code section provides:

(4) *Type of processes recognized as mining for ores or minerals covered by section 613(c)(4)(D).* Cyanidation, leaching, crystallization, and precipitation, which are listed in section 613(c)(4)(D) as treatment processes considered as mining, and the processes (or combination of processes) which are substantially equivalent thereto, will be recognized as mining only to the extent that they are applied to the taxpayer's ore or mineral for the purpose of separation or extraction of the valuable mineral product or products from the ore, or for the purpose of separation or extraction of the mineral or minerals from other material extracted from the mine or other natural deposit. *A process, no matter how denominated, will not be recognized as mining if the process beneficiates the ore or mineral to the degree that such process, in effect, constitutes smelting, refining, or any other nonmining process within the meaning of paragraph (g) of this section.* [Sec. 1.613–4(f)(4), Income Tax Regs.; emphasis added.]

Section 613(c)(5) provides:

(5) TREATMENT PROCESSES NOT CONSIDERED AS MINING.—Unless such processes are otherwise provided for in paragraph (4) (or are necessary or incidental to processes so provided for), the following processes shall not be considered as "mining": electrolytic deposition, roasting, calcining, thermal or electric smelting, refining, polishing, fine pulverization, blending with other materials, treatment effecting a chemical change, thermal action, and molding or shaping.

Respondent argues that the *degree* of beneficiation achieved in the treatment processes applied by petitioner requires the conclusion that the leaching and crystallization processes constitute "refining" as defined in section 1.613–4(g)(6)(iii), Income Tax Regs.:

(iii) The term "refining" refers to processes (other than mining processes designated in section 613(c)(4) or this section) used to eliminate impurities or foreign matter from smelted or partially processed metallic and nonmetallic ores and minerals, as, for example, the refining of blister copper. In general, a refining process is designed to achieve a high degree of purity by removing relatively small amounts of impurities or foreign matter from smelted or partially processed ores or minerals.

Specifically, respondent asserts that the crystallization of previously concentrated standard flotation muriate and previously concentrated soluble muriate to remove a relatively small amount of impurities to produce a 99.9-percent pure product is a secondary crystallization or refining, either of which constitutes a nonmining process under section 613(c)(4)(D) and section 1.613–4(f)(4), Income Tax Regs.

Respondent's conclusion is based upon the following three categories of reasoning: First, the "fines" are essentially products upgraded from a worthless byproduct. The feed for the chemical circuit has been previously concentrated either in a flotation circuit or in the soluble product circuit resulting in an increase in KCl content from about 31 percent at the mine to 94.3-percent KCl. Respondent views the crystallization process in the soluble and chemical circuits as a "secondary crystallization." Because it increases the chemical content of the fines, already at 94.3-percent KCl, to 99.9-percent KCl, the crystallization process is tantamount to the removal of a relatively small amount of impurities, and hence moves out of the scope of "mining" processes.

Respondent next maintains that because the "secondary crystallization" process used by petitioner has "nothing to do with extraction of the ore or mineral from the ground," it must, therefore, to constitute a mining process, come within one of the treatment processes specifically treated as mining under section 613(c)(4)(D). And in order to come within that provision, the process actually employed must be used in the "separation or extraction of the product or products from the ore or the mineral or minerals from other material from the

mine or natural deposit." In other words, because it is applied to previously concentrated waste resulting from "mining" processes rather than ore dust or fines from the mine, it is not applied for the purpose the Code requires. Respondent's argument here rests upon his conclusion that the "concentrate" (fines and dust) which constitutes the feed for the soluble and chemical grade muriate is no longer an ore or mineral within the meaning of section 613(c)(4)(D).

Respondent's final theory is that petitioner's process constitutes refining because the process is designed to achieve a high degree of purity by removing relatively small amounts of impurities from partially processed ores.

Petitioner's position is that it produces its soluble and chemical grade muriate by the leaching[4] and crystallization of muriate fines and dust, treatment processes expressly designated in section 613(c)(4)(D) as "mining" processes.

As to respondent's claim that petitioner's crystallization is a secondary crystallization, we conclude that respondent's characterization is misleading. Because all minerals are generally crystalline in nature, every crystallization, as used in section 613(c)(4)(D), is necessarily a recrystallization. The use of the term secondary crystallization implies that petitioner applied a primary or preceding crystallization process prior to the chemical circuit crystallization. This inference is not supported by the record.[5] The crystalline configuration of PCA's soluble and chemical grade products is basically the same as that of the potassium chloride present in the ore. The chemical composition also remains the same.

Respondent does not claim that the three successive crystallizing vessels in the chemical circuit constitute a secondary crystallization. But even a secondary crystallization would not automatically require classification as a nonmining process. Section 613(c)(4)(D) does not require that the crystallization be primary nor does it preclude successive or combinations of denominated treatment processes. In point of fact, respondent

---

[4]Although respondent took issue with the application of the term "leaching" to petitioner's particular treatment process at trial, he did not make a similar argument on brief and, thus, appears to have abandoned this issue. We find, however, that the treatment processes in issue are leaching and crystallization.

[5]A de minimis portion (2 percent) of the muriate fines used for feed in the chemical circuit are traceable to the soluble muriate and, therefore, have been subjected to a prior crystallization process.

does not challenge the "mining" characterization of the flotation processes even though the standard circuit involves two successive flotation processes. The statute provides for "substantially equivalent processes *or combination of processes* used in the separation or extraction of the product or products from the ore or the mineral * * * from other material from the mine." (Emphasis added.) Sec. 613(c)(4)(D). It is common for a miner to subject his ore to the same processes in a series to achieve a slightly greater degree of beneficiation with each application. We conclude that petitioner's treatment processes are among those specifically denominated in section 613(c)(4)(D) as mining processes.

Respondent's next contention is that PCA's crystallization processes are nonmining because they are not applied for the purpose of separating or extracting the valuable mineral from the ore. The muriate fines which constitute the chemical circuit feed consist almost entirely of the minerals sylvite (potassium chloride), halite (sodium chloride), and clay, the same minerals and gangue material comprising sylvinite ore. These fine particles of sylvinite ore, because of their size, are not susceptible to concentration by flotation. Furthermore, they are produced in petitioner's flotation circuits, which respondent concedes are mining processes. The fact that they are not collected down in the mine is of no moment; that they are collected during the mining process is sufficient.[6]

A concentrate is simply an ore which has been beneficiated. Respondent's own definitions, while we do not judge their accuracy, are consistent with this conclusion. Respondent has defined beneficiation as:

the enrichment of a mineral by separating out the worthless from the valuable components. It includes the dressing or processing of ores for the purposes of: (1) regulating the size of the desired product, (2) removing unwanted constituents, (3) improving the quality, purity * * * of the desired product, (4) concentration or other preparation of ore for smelting, by flotation * * *[7]

Concentration, on the other hand, is defined by respondent as the "process of eliminating substantial amounts of the

---

[6]In *Barton Mines Corp. v. Commissioner,* 53 T.C. 241 (1969), affd. in part, revd. in part, and remanded in part 446 F.2d 981, 986 (2d Cir. 1971), the feed for the garnet powder mill consisted of material rejected from screens, fines from a dryer, and small amounts from the grain mill process.

[7]Rev. Proc. 78–19, 1978–2 C.B. 491, 492.

impurities or foreign matter associated with the ores or minerals in their natural state * * * without changing the physical or chemical identity of the ores or minerals."[8] Respondent defines an ore as "any naturally occurring mineral or mineral aggregate containing valuable constituents."[9] A concentrate is an ore at any of the various stages of beneficiation. The muriate fines and dust are simply particles of the sylvinite ore at a more advanced stage of beneficiation. They are not, however, even beneficiated to the degree that the flotation muriate is, because their KCl content is not yet high enough to be marketable.

We do not agree, as respondent would have us, that a concentration process which beneficiates an ore to 98 percent[10] is mining under section 613(c)(4)(D) but one that beneficiates the ore to 99.9 percent is, as a matter of law, nonmining.

In *Barton Mines Corp. v. Commissioner*, 53 T.C. 241 (1969), affd. in part, revd. in part, and remanded in part 446 F.2d 981 (2d Cir. 1971), the Court of Appeals rejected a similar notion put forth by the Commissioner:

nothing in the statute indicates that an arbitrary percentage should determine which methods constitute beneficiation by concentration, and so construed, the regulation would be without statutory foundation. * * * [446 F.2d at 989.]

As *Barton Mines* directs, we view petitioner's operation "as a whole, not each of its elements in isolation." 446 F.2d at 989. The crystallization process is a continuation of the steps involved in the beneficiation of the ore from a KCl content of 31 percent to a final concentrate at 99.9 percent.

We do not read section 613 as requiring an analysis of the degree of beneficiation involved in a denominated process to determine whether it will be removed from the mining category. As we reiterated in *Union Carbide Corp. v. Commissioner*, 75 T.C. 220 (1980), affd. per curiam 671 F.2d 67 (2d Cir. 1982):

---

[8]Rev. Proc. 78–19, *supra*, 1978–2 C.B. at 493.

[9]Rev. Proc. 78–19, *supra*, 1978–2 C.B. at 496.

[10]See percentages in *Barton Mines Corp. v. Commissioner*, 446 F.2d at 986.

"No reported case has ever denied mining status to an extractive process designed to remove the valuable mineral from the worthless gangue." See *Barton Mines Corp. v. Commissioner*, 446 F.2d at 995. * * * [75 T.C. at 244.]

The court in *Barton Mines* pointed out that, although the Commissioner had succeeded, prior to the Gore amendment, in urging that certain processes be classified as nonmining, none of those cases involved "processes that removed commercially unusable impurities and purified the mineral to a level dictated by competition." *Barton Mines Corp. v. Commissioner*, 446 F.2d at 995 n. 8.

In *Ranchers Exploration & Dev. Corp. v. United States*, 634 F.2d 487, 491 (10th Cir. 1980), the process in dispute was electrowinning, which the court held was a "precipitation" process. Respondent argued in *Ranchers Exploration* that, although precipitation is a denominated mining process, electrowinning was nonmining because it involved electrolytic deposition, a process excluded from "mining" in the parenthetical language of section 613(c)(4)(D) and specifically designated as a nonmining process in section 613(c)(5).

In rejecting respondent's argument that a process which was inherently a precipitation process could be transformed into a nonmining process, the Court of Appeals stated that:

The essence of sec. 613(c)(4)(D), as recognized by the regulation [sec. 1.613-4(f)(4), Income Tax Regs.], is that a process constitutes mining if its function and purpose is to separate valuable products from otherwise valueless ore. * * * [634 F.2d at 493.]

In 1930, the Joint Committee on Internal Revenue Taxation issued a report on depletion of metal mines. A report prepared by a mining engineer, Alex R. Shepherd, employed by the Joint Committee, was attached to the Joint Committee report as an appendix.[11] It is considered a prime source of legislative intent with regard to percentage depletion of hard minerals.[12]

The Shepherd report discussed the various processing stages through which metals[13] pass, from the crude ore stage up to the final manufactured product:

---

[11]Preliminary Report on Depletion, Staff Reports to the Joint Comm. on Internal Revenue Taxation (1930), Appendix XXXI (Shepherd report).

[12]See *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 81–83 (1960).

[13]The metals discussed in the Shepherd report were lead, zinc, iron ore, copper, silver, and gold.

(1) Mining, or getting the metal-bearing rock out of the ground; (2) Concentrating, or separating the profitable portions of the [ore] from the unprofitable. * * *; (3) Smelting, or isolating the metallic constituents as impure bullion * * * after melting the whole of the concentrate * * * in a suitable furnace; (4) Refining or separating the metals from each other; [and] (5) Marketing the refined products.[14]

Mr. Shepherd described a progression from crude, concentrate, smelted, refined, to marketed, in the context of metals which became the basis of percentage depletion for nonmetallic ores. Thus, section 613(c)(4)(D) suggests in the context of its history that treatment processes in the various industries lie on a continuum with mining processes at one end and manufacturing at the other.

Read literally, the regulations here in issue could be interpreted as requiring a "degree of beneficiation" test to determine whether a treatment process, even a specifically denominated process, has been transformed into a nonmining process. Respondent's literal interpretation, however, is not supported by the legislative history of the statutory scheme or by the plain language of the statute which lists certain processes but does not establish any arbitrary percentage cutoff points.

Refining is a broad term encompassing a large number of processes. Conceptually, the term overlaps with beneficiation or concentration insofar as it refers to the removal of impurities or the alteration of the chemical composition[15] of a material, frequently a metallic ore, to obtain a desired product in a reasonably pure form.

We conclude that "refining" as defined in the regulations and as used in sections 613(c)(4)(D) and 613(c)(5) refers to purification processes further along the continuum than those used by petitioner to beneficiate its ore or concentrate.

The fact that some mining processes occur beyond what is traditionally viewed as mineral dressing but before actual smelting supports this conclusion. For example, in *Ranchers Exploration & Dev. Corp. v. United States, supra,* the Court of Appeals held that electrowinning was a mining process.

---

[14]Shepherd report, *supra* at 71.

[15]Some of the denominated mining processes in sec. 613(c)(4)(D) do effect chemical changes. *Union Carbide Corp. v. Commissioner,* 75 T.C. 220, 246 n. 28 (1980), affd. per curiam 671 F.2d 67 (2d Cir. 1982).

Electrowinning might customarily be considered to fall into the category of process metallurgy, the stage after mineral dressing. It is noteworthy that the copper content of electrowon cathodes is about 99.9 percent before fire refining or electrolytic refining, processes often used in place of direct smelting.

Based upon the above discussion, we hold that petitioner's leaching and crystallization processes which produce soluble and chemical grade muriate are mining processes within the meaning of section 613(c)(4)(D), so that the gross income attributable to such processes constitutes gross income from mining.

## Issue 2. Storage at the Mines

Economy in operation requires that PCA mines and concentration plants run on a relatively continuous basis.[16] The mine and plant in Carlsbad operate three shifts daily, 7 days a week, 365 days a year, except for occasional shutdowns for maintenance.

All potash producers in North America have storage facilities at their mine sites. In order to keep the plant running, it is necessary to remove the potash from the end of the concentration operation as it is produced. Because it is not feasible to start up the plant each time a customer wants some potash and then close it down after the order is filled, it is necessary to have storage facilities nearby to hold the production. In addition, product shipments in response to customer orders are irregular and to some extent seasonal.

It is also impractical for purchasers to come to the mine; as a result, it has been the longstanding practice that virtually all metals and minerals produced in this country are sold f.o.b.[17] mine or mill, or on a delivered price basis. During the taxable years in issue, substantially all of petitioner's muriate was stored under cover in its plant warehouses. In Carlsbad during the taxable years 1971–74, some of petitioner's granular grade product, thought to be less susceptible to deterioration from

---

[16]The Saskatoon plant operated on a restricted schedule during the 1971–74 period due to production quotas imposed by the Saskatchewan Provincial Government.

[17]F.O.B. or "free on board" means that "the seller must at that place [e.g., the mine] ship the goods * * * and bear the expense and risk of putting them into the possession of the carrier." U.C.C. sec. 2–319(1)(a)(1978).

exposure because of its larger particle size, was stored outside on concrete or asphalt slab with unsatisfactory results. Exposure to the elements causes product loss, quality deterioration, and caking. When excess water is absorbed, the material must again be run through a dryer before it can be shipped to customers. In Saskatoon, open storage is out of the question.

The first warehouse in Carlsbad was built in 1935 and the last one in 1957. Each warehouse is simply a concrete floor covered by a high-peaked roof made of corrugated metal sheeting. Storage under cover eliminates the need to run the material through a dryer a second time. Storage does not change the physical or chemical identity or composition of the potash nor does it beneficiate or improve the muriate—it merely protects the product.

The fertilizer business is seasonal; accordingly, PCA's inventory levels usually fluctuate during the year. The peak demand months are March, April, and May and, in some parts of the country, a secondary season exists in October and November.

To reduce its carrying and storage costs, PCA often offered price discounts during low demand times to encourage even purchasing throughout the year. PCA did not hold or store potash until peak season in an attempt to obtain higher prices. Delays in recovering costs and realizing profits plus increased carrying costs outweighed any advantage from a higher price during the peak season. PCA's contracts usually required customers to accept delivery of the potash in equal monthly shipments. Certain customers did receive uneven shipments, i.e., greater amounts during peak seasons.

Storage costs at Carlsbad and Saskatoon during the taxable years in issue were as follows:

| Carlsbad | | Saskatoon | |
|---|---|---|---|
| 1971 | $87,941 | 1971 | $155,677 |
| 1972 | 74,987 | 1972 | 162,821 |
| 1973 | 78,004 | 1973 | 178,574 |
| 1974 | 81,905 | 1974 | 189,742 |
| Total | 322,837 | Total | 686,814 |

PCA incurred the following costs to produce its muriate products up to the point of storage:

| Carlsbad | | Saskatoon | |
|---|---|---|---|
| 1971 | $9,788,649 | 1971 | $5,436,299 |
| 1972 | 10,341,371 | 1972 | 5,359,134 |
| 1973 | 10,461,106 | 1973 | 5,885,607 |
| 1974 | 11,456,708 | 1974 | 7,738,348 |
| Total | 42,047,834 | Total | 24,419,388 |

These prestorage production costs averaged $12.56 on a per-ton basis.

The Commissioner, in his notice of deficiency, determined that the storage of PCA's muriate products at its mines was a nonmining process and recomputed PCA's gross income from mining by use of the proportionate profits method excluding storage costs from the proportionate profits fraction.

The second issue for our decision is whether petitioner's storage of its muriate at the mines is a mining process. No case has specifically addressed this issue in the context of section 613(c)(4)(D) or "D" minerals.[18] Potash is a "D" mineral.

A miner's percentage depletion allowance is a certain percentage of his "gross income from mining." It is, however, subject to a limitation of 50 percent of the taxable income from the property. Secs. 613(a) and 613(c)(1). The regulations promulgated under section 613 establish three[19] alternative methods for determining gross income from mining: (i) The actual sales method, (ii) the representative market or field price method, and (iii) the proportionate profits method. See sec. 1.613–4(b), (c), and (d), Income Tax Regs.

Section 1.613–4(b)(1), Income Tax Regs., provides that if an ore or mineral is sold after the application of only mining processes, gross income from mining is "the actual amount for which the ore or mineral is sold." In other words, the actual sales price received by the miner for his mineral product determines his gross income from mining.

If, however, the miner subjects his mineral product to nonmining processes prior to its sale, section 1.613–4(c)(1), Income Tax Regs., provides that:

---

[18] "D" minerals are those minerals which are not customarily sold in a crude form. Sec. 613(c)(4)(C) categorizes those minerals which are customarily sold in a crude form. These minerals are referred to as "C" minerals.

[19] See sec. 1.613–4(d)(1)(ii)(c), Income Tax Regs., where neither the taxpayer's established method nor the proportionate profits method clearly reflects gross income from mining.

gross income from mining shall be computed by use of the representative market or field price of an ore or mineral of like kind and grade as the taxpayer's ore or mineral after the application of the mining processes actually applied * * *

The representative market or field price is to be used, where possible, to ascertain the approximate price at which the miner could have sold his mineral after the application of only mining processes. The price is determined by looking at competitive sales made by other miners or by the miner himself at the cutoff point. If the mineral compared is, in common commercial practice, sufficiently similar in chemical, mineralogical, or physical characteristics to the taxpayer's, and used or is suitable for essentially the same purpose as to uses to which the taxpayer's mineral product is put, then it is of like kind and grade.

The third method, the proportionate profits formula, must be used when it is impossible for a miner to establish a representative market or field price, such as where there are no sales prior to the application of nonmining processes. Sec. 1.613–4(d)(1), Income Tax Regs. The assumption underlying the proportionate profits method is that each dollar of cost incurred in the production of a mineral product contributes proportionately to the income earned upon its sale. Sec. 1.613–4(d)(4)(i), Income Tax Regs.

To compute gross income from mining under the proportionate profits method, the amount of the miner's gross sales from his first marketable product or group of products is multiplied by a fraction, the numerator of which is the sum of the miner's costs allocable to mining processes and the denominator of which is the sum of all costs including nonmining costs (sec. 1.613–4(d)(4)(ii), Income Tax Regs.):

$$\text{Gross income} = \text{Gross sales} \times \frac{\text{Mining costs}}{\text{Total costs}}$$

Respondent's legal theory begins with section 613(c)(4)(D) which designates certain specific treatment processes as mining. They are, in general, crushing, grinding, and beneficiation by concentration, cyanidation, leaching, crystallization, precipitation, or "by substantially equivalent processes or combination of processes used in the separation or extraction of the

product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit."

Neither storage nor loading for shipment is among the named processes of section 613(c)(4)(D). Section 613(c)(4)(C) does, however, expressly designate loading for shipment as a mining process. From this, respondent finds a congressional intent to treat loading for shipment of "D" minerals as a nonmining process.

Storage is not mentioned in either the case of "C" or "D" minerals. Respondent's determination as to storage depends upon whether its subsequent loading is a mining or nonmining process. Respondent's position is that the storage of potash at the mine site is a nonmining process because it is not "necessary" or "incidental" to the preceding mining processes but is, rather, related to the subsequent "loading for shipment," which he considers a nonmining process.[20]

Section 613(c)(2) provides that mining includes "treatment processes necessary or incidental" to those processes designated as mining in section 613(c)(4).

Section 613(c)(5) lists certain processes not considered mining processes, unless specified in section 613(c)(4) or shown to be necessary or incidental to a specified mining process.

Respondent would require computation under the proportionate profits method, arguing that petitioner does not sell its potash prior to the application of what he considers to be the nonmining processes of storage and loading for shipment. If respondent is correct that these are nonmining processes, then PCA would be unable to use either its actual sales price or the representative market or field price methods of computation. In effect, respondent would categorically require the use of the proportionate profits method by all miners of "D" minerals where storage is precedent to loading for shipment.[21]

PCA makes two major arguments. The first is that storage of its muriate is a mining process because the muriate products stored are mined, not manufactured products. This being the case, it should be permitted to calculate its percentage deple-

---

[20]"Loading for shipment" is analyzed in Issue 3.

[21]Respondent also attempts to portray PCA's storage as a "marketing or sales tool" or a "stockpiling" technique in order to command higher prices. The record, however, does not bear out this assertion. Furthermore, as respondent acknowledges, there are other important reasons for storage.

tion on the f.o.b. mine sales price of its muriate. The second argument is that storage is "necessary or incidental" to the preceding mining processes and should not transform a mined product into a manufactured product.

With respect to PCA's first argument, we must first decide whether storage and loading for shipment of "D" minerals were categorically intended to be nonmining processes as respondent would have us hold. The effect of such a holding would be to require the entire potash industry to calculate gross income from mining using the proportionate profits method—the least desirable and most inaccurate method of computation. It would, in effect, constitute a prohibition on the use of the actual sales price or representative field or market price for virtually all taxpayers who mine minerals in the "D" mineral category. It also means that miners who produce their mineral product solely by application of mining processes would be unable to use the f.o.b. mine sales price to determine their gross income from mining.

We conclude that such a result is unintended. It is contrary to the legislative history of the depletion statute which shows that Congress intended that gross income from mining should be based upon the actual sales price or market price, or its equivalent on an f.o.b. mine, mill, or well basis.[22] Evidence of this intention is found in regulations issued by the Treasury in 1933[23] and in discussions relating to the 1960 Gore amendment.[24]

In 1933, Treasury regulations provided that gross income from mining should be based upon market price or its equivalent as of the date of sale, "before transportation from the immediate vicinity of the mine." These regulations also provided that gross income from mining should be the amount for which the miner sells his mineral product but not in excess of the "representative market or field price" after the application of mining processes but prior to smelting and refining.[25]

PCA operations in Carlsbad and Saskatoon are not those of an integrated miner-manufacturer of compound fertilizers, as

---

[22]Shepherd report, *supra* at 73.

[23]Art. 221(g), Regs. 77 (1933).

[24]See Sherfy, "Recent Developments in Meaning of 'Gross Income from Mining' for Computation of Percentage Depletion," 6 Rocky Mtn. Min. L. Inst. 147 (1961); Fernald, "Gross Income from Mining: A Critique of Cannelton," 23 N.Y.U. Inst. 1379 (1965).

[25]Art. 221(g), Regs. 77 (1933).

that term is customarily used. A nonintegrated miner is one who sells his mineral products prior to the application of nonmining or manufacturing processes. In theory, he sells his products before the so-called "cutoff" point where nonmining begins for purposes of computing his gross income from mining. In this case, section 1.613–4(b)(1), Income Tax Regs., provides that after application of mining-only processes, the percentage depletion rate is based upon the amount for which the mineral is sold.

In the case of an integrated miner-manufacturer, where he takes his product beyond the cutoff point and applies nonmining processes, he may not use the actual sales proceeds as the starting point for his percentage depletion calculation. He must, instead, use one of the alternative methods of calculation which purports to yield an amount comparable to that which a miner would have received had he sold his product at the cutoff point.

The intention of Congress has been to treat large integrated miner-manufacturers the same as small miners who have only a mine and a mill. At congressional hearings held in 1942, the Chief of the Natural Resources Section of the Internal Revenue Service explained this concern, as follows:

Basically, we have the conception we should treat all taxpayers alike. * * *

In the committee hearings, it was made clear that the basis of gross income for the property was to be net smelter returns to the operator of the mine; in other words, depletion relates to the price he could get for the concentrates from a smelter * * *. We then found ourselves face to face with taxpayers who own mines, smelters, refineries, and marketing systems. These taxpayers contended they should have depletion based on the sale of the refined product—the metal. If we had allowed that, it would have provided them with a substantially greater depletion allowance than the miner would have, who only owns a mine and a mill. * * * What the mine owner would have sold the ore for in the form of a concentrate at the mine provides the gross income from the mining * * *. * * * we must deduct from the selling price the costs of other processes such as smelting, roasting, refining, selling, and the proportionate profits attributable to those, to arrive at gross income from the mining property.[26]

Hearings prior to the Gore amendment also indicate that the Treasury had always considered loading for shipment of

---

[26]Hearings Before a Subcomm. of the Special Senate Comm. on the Investigation of Silver, 77th Cong., 2d Sess. 763–764 (1942).

"D" ore or concentrate at the minesite a mining process.[27]

We further point out that the current regulations provide that "The costs attributable to the operation of warehouses * * * for *manufactured* products shall be considered as non-mining costs"[28] and that "storage or warehousing of *manufactured* products shall not be considered as mining." (Emphasis added.)[29] This illustrates the distinction between minerals produced solely by application of mining processes and those which have been subjected to nonmining-manufacturing. Similar provisions existed in the precursor regulations as far back as 1956.[30] In contrast to this unequivocal characterization of manufactured products, there is no suggestion in the regulations that storage and loading for shipment at the mine of "mined-only" products should be designated as nonmining.

Ores and minerals in the "C" category are customarily sold in a crude form, thus they are subjected to relatively simpler treatment processes. There is usually no question that "C" minerals have not reached the nonmining "cutoff" point prior to storage and loading for shipment. For these minerals, it follows that storage and loading for shipment are virtually always mining processes.

In the case of "D" minerals, however, the line is not so clearly drawn because, by their very nature, "D" minerals require a greater degree of processing. The mining versus manufacturing issue frequently arises in the case of "D" minerals. Thus, it follows that no blanket statement concerning storage and loading for shipment is feasible. Yet, in the case of manufactured products, the regulations do provide that storage and loading for shipment are nonmining processes. We are persuaded that the statutory scheme and the regulations thereunder contemplate that the determination of whether storage of a "D" mineral is a mining process will depend upon whether the product being stored and subsequently loaded is a mined-only product.

Petitioner raises two other points in support of its first argument which merit discussion. If an ore or mineral is sold

---

[27] See Hearings on Mineral Treatment Processes for Percentage Depletion Purposes Before the Comm. on Ways and Means, 86th Cong., 1st Sess. 1b-2 (1959).

[28] Sec. 1.613–4(d)(3)(iii)(c), Income Tax Regs.

[29] Sec. 1.613–4(g)(3), Income Tax Regs.

[30] See, e.g., sec. 1.613–3(d)(5), Proposed Income Tax Regs. (1956), which stated that loading for shipment of a manufactured product was not an ordinary treatment process.

after the application of only mining processes, section 1.613–4(b)(1), Income Tax Regs., provides that gross income from mining is "*the actual amount* for which the ore or mineral is sold." (Emphasis added.) The example in the regulation is of a taxpayer who sells several sizes of crushed gypsum and gypsum fines, and provides that gross income from mining in that case would be "the total amount for which such crushed gypsum and fines are actually sold." Sec. 1.613–4(b)(1), Income Tax Regs. This regulation is not limited to "C" minerals, but applies as well to "D" minerals sold after the application of mining processes. Petitioner asserts that although this regulation does not explicitly mention storage at the mine site, it seems clear that "the actual amount for which the ore or mineral is sold" refers to the sales price of the ore after some storage. We find this a reasonable inference in light of the fact that virtually all miners store their products for any number of reasons.

Petitioner's next point is that under section 1.613–4(e)(2)(i), Income Tax Regs., a miner's gross income from mining may also be computed starting with the taxpayer's delivered price and subtracting the costs incurred for "purchased transportation to the customer," from the delivered price of his mineral product which has been produced solely by mining processes. No reduction is required by the regulation for the miner's costs of storage at the mine. By its terms, section 1.613–4(e)(2)(i), Income Tax Regs., is also applicable to "D" minerals. Petitioner argues that a delivered price necessarily includes the miner's storage at the mine before loading for shipment and transportation to the customer; and, therefore, this regulation is consistent with its view that storage at the mine (for both "C" and mined-only "D" minerals) is a mining process.

Although the cases cited by both parties do not address the specific question of whether storage of "D" minerals is a mining process, they do provide some support for petitioner's position. *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960), indicates that "Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, *i.e.*, where the ordinary miner shipped the product of his mine." 364 U.S. at 87.

The Supreme Court embraced the Shepherd report recommendation that gross income from mining be calculated using

"the competitive market receipts, or its equivalent, received from the sale of the crude products, or concentrates on an f.o.b. mine, mill, or well basis." 364 U.S. at 83.

*Dow Chemical Co. v. Commissioner*, 51 T.C. 669 (1969), affd. 433 F.2d 283 (6th Cir. 1970), involved potassium chloride extracted from brine. In that case, we held that Dow Chemical's gross income from mining was the "actual sales price" of the potash extracted from the brine. In the case of bromine, also an issue in the case, we allowed depletion based upon "f.o.b. plant price."

We conclude that petitioner's storage of its potash, which we found to be mined-only at the point of storage, is not transformed into a manufactured product by virtue of its storage. We do not find support for respondent's position which would effectively convert all miners who store and load their products for shipment into integrated miner-manufacturers.

Virtually all minerals produced in the United States are stored (and loaded for shipment) by the miner at the minesite and sold f.o.b. mine or mill. If storage and loading for shipment are always nonmining processes, by definition, all "D" miners will be required to use the proportionate profits method of computation. Respondent's position works an inequity against the more efficient miner by arbitrarily reducing his percentage depletion deduction because he stores and loads his product for shipment. A simple example illustrates: Assume two miners, A and B. Both sell muriate f.o.b. mine for $100. Miner A extracts the ore from the ground for $10 and miner B extracts it for $5. It costs both miners $40 to concentrate the muriate and both miners $10 to store it. Percentage depletion under the proportionate profits method would be computed on the following selling prices:

*Miner A*

$$\$100 \text{ (selling price)} = \frac{\$10 \text{ (extraction)} + \$40 \text{ (concentration)}}{\$50 \text{ (same as above)} + \$10 \text{ (storage)}} \times \$83.33$$

*Miner B*

$$\$100 \text{ (selling price)} = \frac{\$5 \text{ (extraction)} + \$40 \text{ (concentration)}}{\$45 \text{ (same as above)} + \$10 \text{ (storage)}} \times \$81.82$$

We conclude that Congress did not intend such a result for petitioner and other miners of "D" minerals.

The phrase "necessary or incidental" was added to sections 613(c)(2) and 613(c)(5) by the Senate-House Conference Committee considering the Gore amendment.[31] In *Barton Mines Corp. v. Commissioner*, 53 T.C. 241 (1969), affd. in part, revd. in part, and remanded in part 446 F.2d 981 (2d Cir. 1971), we pointed out that "the conference incorporated the more liberal phrase 'necessary or incidental' into the general definition of mining in section 613(c)(2), thus making it applicable to all processes, expressly to assure flexibility." 53 T.C. at 255.

The statute does not define a necessary process. In *Barton Mines*, the Court of Appeals held that a process is necessary to a mining process if it is "essential or indispensable to the performance of the mining operation." 446 F.2d at 991. The regulations provide that a process is "necessary" if the mining process cannot be "effectively accomplished" without the other process. Sec. 1.613-4(f)(2)(iii), Income Tax Regs.

Respondent points to section 1.613-4(f)(2)(iii), Income Tax Regs., which also provides that a process is " 'necessary' to another related process if it is prerequisite to the performance of the other process." This regulation contains an example in which a mining process cannot be effectively applied to a mineral without its prior storage. Respondent interprets this to mean that storage will be considered "necessary" only when a subsequent mining process follows. Because it is respondent's position that loading for shipment is a nonmining process, the preceding step (storage) is not "necessary to a subsequent mining process" (loading for shipment). Here respondent goes too far in quoting this Court out of context in *Carborundum Co. v. Commissioner*, 70 T.C. 59 (1978). We find no such requirement.[32] Hypothetically, however, petitioner, in the instant case, would still meet such a requirement because its storage was necessary to the subsequent mining in the sense that the product had to be removed before more could be produced.

In further support for his position, respondent makes the following statements on brief, "At Saskatoon, the ability to store the product was vital to the very operation of the plant"

---

[31]Conf. Rept. 2005, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 741, 746.

[32]See, e.g., *Ranchers Exploration & Dev. Corp. v. United States*, 634 F.2d 487 (10th Cir. 1980), where the Tenth Circuit recently concurred in a finding that an electrowinning process was necessary to a *preceding* leaching process.

due to Government imposed quotas on potash producers. "[T]here are no potash industry sales prior to warehousing and loading for shipment." We accept respondent's characterization but find, instead, that it supports petitioner's position. For this and other reasons discussed above, we find that PCA's storage of its muriate products was necessary to its mining processes.

A process is incidental to another related process if its cost is "insubstantial in relation to the cost of the other process." Sec. 1.613–4(f)(2)(iii), Income Tax Regs. PCA's storage was also "incidental" to its mining processes. It was clearly "related" to the continued operation of the mines, and its costs were "insubstantial" in relation to the cost of the other processes. At Carlsbad and Saskatoon during the taxable years 1971 through 1974, PCA's storage costs averaged $0.19 per ton of muriate; mining costs up to the point of storage were approximately $12.56 per ton. Based upon the foregoing discussion, we hold for petitioner on this issue.

### Issue 3. Loading for Shipment

The third issue in this case is whether petitioner's loading for shipment of its muriate products at the mines is a mining process.

Substantially all of PCA's muriate is shipped from Carlsbad and Saskatoon by rail. Almost all of PCA's customers are located in cities and towns far distant from PCA's mines.

The sale of bulk minerals, as an economic matter, requires that the products be loaded for shipment by the miner at the plant. Specialized equipment is necessary, and it is impractical to expect or permit PCA's customers to supply or operate the equipment.

In Carlsbad, the muriate stored in the warehouses is pulled or pushed toward recesses or "slusher pits" in the floor of the warehouses by means of a large shovel-like slusher bucket. The slusher pits are covered with a metal grill called a grizzly. Muriate not within the reach of the slusher bucket is occasionally moved by a Caterpillar tractor into an area where it can be reached by the slusher bucket.

Each warehouse in Carlsbad has one or two slusher pits. The slusher pits are located immediately inside the longitudinal edge of each of the warehouses. Slusher buckets on cables and

pulleys pull the muriate directly into the slusher pits but cannot move muriate horizontally or sideways.

The muriate falls through the grizzly into the slusher pit, and then onto a conveyor which moves the muriate out of the warehouse to an adjacent loading station, where it is dumped into railcars. The loading stations in Carlsbad are located alongside of, or over, railroad spur tracks.

In Saskatoon, the process is slightly different. There are no slusher buckets; the muriate simply drops through drop points or "feeders" in the floor of each warehouse onto underground conveyor belts. The drop points are centrally located in each of the warehouses. The muriate is stored on top of the drop points and naturally flows by gravity through the drop points onto underground conveyor belts. These conveyor belts move the muriate to inclined conveyor belts which then take it to the top of a central "load-out" building from which it is dropped into railcars.

Loading costs at Carlsbad and Saskatoon during the taxable years 1971–74 were as follows:

| Carlsbad | | Saskatoon | |
|---|---|---|---|
| 1971 | $776,233 | 1971 | $289,364 |
| 1972 | 768,204 | 1972 | 223,336 |
| 1973 | 859,485 | 1973 | 259,537 |
| 1974 | 817,401 | 1974 | 332,361 |
| Total | 3,221,323 | Total | 1,104,598 |

The loading of muriate for shipment does not beneficiate or improve the muriate or alter its chemical content.

The Commissioner determined that PCA's bulk loading of muriate at its plants was a nonmining process and in recomputing its gross income from mining using the proportionate profits method, excluded such costs from the proportionate profits fraction.

In many regards, the arguments previously discussed under Issue 2 parallel the arguments made here to establish the classification of PCA's loading for shipment. Loading for shipment is not listed as a mining process in section 613(c)(4)(D) nor as a nonmining process in section 613(c)(5).

Petitioner argues that, if a "D" mineral has been produced solely or essentially by mining processes, loading for shipment should be treated as a mining process. On the other hand, if a

"D" mineral has been subjected to nonmining processes, loading for shipment is properly treated as a nonmining process.

Respondent argues that because section 613(c)(4)(D) omits any mention of loading for shipment, while section 613(c)(4)(C) expressly designates loading for shipment as a mining process, an inference should be drawn that Congress intended to treat loading for shipment of all "D" minerals as a nonmining process.

Respondent cites two cases involving the issue of whether bagging or sacking was an ordinary treatment process under the pre-Gore amendment depletion statute. They are: *United States v. Utco Products, Inc.*, 257 F.2d 65 (10th Cir. 1958); and *American Gilsonite Co. v. Commissioner*, 28 T.C. 194 (1957), revd. and remanded 259 F.2d 654 (10th Cir. 1958), cert. denied 359 U.S. 925 (1959).

In *Utco Products*, the court, in holding that bagging and sacking were nonmining processes, analogized that activity to loading for shipment noting, that while the statute made loading for shipment a nonmining process for "C" minerals, it made "no such provision with respect to perlite" or its storage. Because perlite is a "C" mineral, we assume that the court was referring to the mineral in issue, expanded perlite. It is clear that the process of expanding perlite by application of artificial heat is a nonmining process. Sec. 1.613–4(g)(6)(viii), Income Tax Regs. See also section 1.613–4(f)(3)(ii), Income Tax Regs., which refers to the expanding of perlite as an example of a nonmining process which can be applied to a "C" mineral. In fact, the court held that "expanded perlite" was a refined product. Because the mineral involved was a manufactured product, its subsequent loading for shipment would not, by definition, qualify as a mining process.[33] This places the Tenth Circuit's statement, gratis dictum, in a different context, and it is distinguishable on that basis.[34]

In *American Gilsonite*, the Court of Appeals held that income attributable to the bagging of gilsonite,[35] a hydrocar-

---

[33] Sec. 1.613–4(d)(3)(iii)(b), Income Tax Regs.

[34] In this regard, however, compare sec. 1.613–4(d)(3)(iii)(a), Income Tax Regs., with sec. 1.613–4(d)(3)(iii)(b), Income Tax Regs., bagging is always nonmining; loading for shipment of *manufactured* products is nonmining.

[35] The Court of Appeals determined that gilsonite was a mineral not customarily sold in a crude form. The Treasury, however, has acknowledged that it is a "C" mineral. See sec. 1.613–3(f)(5)(iii)(f), Proposed Income Tax Regs. (1968).

bon substance, and its subsequent loading for shipment was not includable in gross income from mining. 259 F.2d at 657. This opinion, we believe, is consistent with a position that storage and loading for shipment of "D" minerals can be a mining process. Bagging, as previously mentioned, is always a nonmining process. It thus follows that a subsequent-to-bagging loading would be a nonmining process as well.

We conclude that Congress did not intend to deny mining status to loading for shipment in the case of all "D" miners. This inference is unwarranted for several reasons. First, the statute does not classify loading for shipment of "D" minerals either way. If loading for shipment were categorically intended to be a nonmining process, Congress could have listed it as nonmining under section 613(c)(5). It chose not to do so.

Second, section 613(c)(4)(D) omits any reference to loading for shipment because deciding whether it is a mining process will depend upon whether the mineral has been subjected to manufacturing or nonmining processes prior to loading. The regulations make clear that:

The costs attributable to the bulk loading of *manufactured* products shall be considered as nonmining costs. [Sec. 1.613–4(d)(3)(iii)(*b*), Income Tax Regs.; emphasis added.]

This regulation does not distinguish between "C" or "D" minerals. Its focus is, instead, on the mined versus manufactured status of the product being loaded. Loading for shipment, in the case of section 613(c)(4)(A), (B), and (C) minerals is virtually always a mining process. If, however, the product has been "refined," "manufactured," or subjected to a nonmining process, section 1.613–4(d)(3)(iii)(*b*), Income Tax Regs., will govern. Very few treatment processes are allowable as mining for "C" minerals.

In contrast, "D" minerals are not customarily sold in the form of a crude mineral product and are frequently subjected to numerous treatment processes. Their classification is not so clear cut and Congress set forth no blanket rule. Congress did, however, intend to be more restrictive with "C" minerals than with "D." The Court of Appeals understood this and explained in *Barton Mines*:

both the pre-Gore amendment statute and the present statute distinguish between minerals that are normally marketed in crude form and those, like

garnet, that are not. The former class of minerals is entitled to fewer allowable treatment processes than the latter, and the clear legislative policy is to allow depletion only on the treatment processes designed to bring the crude mineral product "to shipping grade and form." [446 F.2d at 995.]

It is unlikely, then, that Congress would have permitted loading for shipment to be a mining process for "C" minerals but not for mined-only "D" minerals.

Finally, petitioner offers another explanation of why loading for shipment is specifically listed in section 613(c)(4)(C). Congress allowed depletion on "C" minerals for treatment processes which bring the mineral product "to shipping grade and form." Because loading occurs *after* the mineral has reached shipping grade and form, it was necessary to include a specific reference to loading for shipment in section 613(c)(4)(C). There is no "shipping grade and form" limitation in the case of "D" minerals and thus no specific reference in section 613(c)(f)(D) was needed.

For the reasons discussed above, we hold for petitioner on this issue.

## *Issue 4. Like Kind and Grade*

From time to time, PCA diverts a portion of its standard grade muriate at Carlsbad for shipment to Dumas and Fort Worth, Tex., for conversion into potassium sulphate by non-mining processes. Potassium sulphate is one of the constituents in fertilizers used on certain crops such as tobacco and grapes which are harmed by fertilizers containing potassium chloride.

Standard, coarse, and granular products produced at Carlsbad and Saskatoon are treated with oil to reduce the amount of dust that rises during the handling of these products. The oil added to the muriate has no agricultural value as a plant fertilizer.

The oil is added to the flotation muriate as it passes into mixing screws or screw conveyors on its way to the warehouse. The amount of oil added is relatively small, averaging less than 2 pounds per ton of muriate.

The average yearly cost of oil per ton of standard grade muriate in Carlsbad and Saskatoon is as follows:

| | Carlsbad | | Saskatoon |
| --- | --- | --- | --- |
| Year | Oil cost $/per ton of standard | Year | Oil cost $/per ton of standard |
| 1971 | $0.022 | 1971 | $0.019 |
| 1972 | 0.030 | 1972 | 0.020 |
| 1973 | 0.031 | 1973 | 0.018 |
| 1974 | 0.059 | 1974 | 0.028 |

The muriate shipped to Dumas and Fort Worth for conversion into potassium sulphate is not treated with oil.

As the muriate emerges from the dryers and air sizers at Carlsbad, it retains a microscopic coating of amines, a residue from the flotation process. Amines are animal or vegetable fats, such as tallow, which are solid at normal temperatures. These amines form a waterproof coating which, to some degree, protects the muriate particles from absorbing water from humid air and then caking.

During the 1971–74 period, the average amount of amine added to the soluble grade muriate at Carlsbad was approximately 0.4 of a pound per ton. The amine used is a proprietary product with the trade name of "Armac HT." The average yearly cost of Armac HT applied per ton of soluble muriate in Carlsbad is shown in the following table:

| Year | Delivered Armac HT cost $/per pound | Pounds Armac HT applied per ton of soluble | Cost Armac HT applied $/per ton of soluble |
| --- | --- | --- | --- |
| 1971 | $0.412 | 0.38 | $0.1566 |
| 1972 | 0.411 | 0.39 | 0.1603 |
| 1973 | 0.460 | 0.37 | 0.1702 |
| 1974 | 0.661 | 0.40 | 0.2644 |

During the same 4-year period, the rate of application for amine at Saskatoon for anticaking purposes was approximately 0.4 pounds per ton for soluble grade muriate, 0.25 pounds per ton for standard grade muriate (with approximately 0.1 pounds per ton for coarse and 0.3 pounds per ton for granular products). The average yearly cost of anticaking amine, applied per ton of standard and soluble grade muriate in Saskatoon, is shown in the following table:

### Standard Muriate

| Year | Delivered cost $/pound | Pounds applied per ton of standard | Cost applied per ton of standard |
|------|------------------------|-------------------------------------|-----------------------------------|
| 1971 | $0.270 | 0.25 | $0.0675 |
| 1972 | 0.275 | 0.25 | 0.0688 |
| 1973 | 0.420 | 0.25 | 0.1050 |
| 1974 | 0.560 | 0.25 | 0.1400 |

### Soluble

| Year | Delivered cost $/pound | Pounds applied per ton of soluble | Cost applied per ton of soluble |
|------|------------------------|------------------------------------|----------------------------------|
| 1971 | $0.270 | 0.40 | $0.1080 |
| 1972 | 0.275 | 0.40 | 0.1100 |
| 1973 | 0.420 | 0.40 | 0.1680 |
| 1974 | 0.560 | 0.40 | 0.2240 |

This amine coating interferes with the sulphate conversion processes both at Dumas and Fort Worth. As a result, no post-flotation amine is added at the Carlsbad plant, either for anticaking or for any other purpose, to the standard, coarse, or granular grade muriate going into Dumas and Fort Worth.

The material sent to Dumas and Fort Worth for conversion into potassium sulphate is referred to as "M-car" standard. It is called "M-car" because the railroad sidings at Dumas to which the muriate is consigned is called the "Machovec" siding.

After flotation, the entire standard product stream passes through the standard product dryer where some of the residual flotation amines are removed. This dryer is set at about 350 degrees Farenheit. A portion of the standard muriate, the "M-car" standard, is diverted from the flotation circuit just prior to the point where dust control oil is added by means of a variable-speed feed screw. Then, it is sent through a second dryer, the "M-car" dryer. Only part of the standard is diverted, however, because this M-car dryer does not have the capacity to handle the whole stream.

The M-car dryer consists of two principal components, a rotating cylinder containing the muriate, and a firebox with a flame which heats the air sent to the rotating cylinder. The M-car dryer is heated to approximately 550 to 600 degrees Farenheit where a greater percentage of the amine left from the flotation process is removed, amounting to about 1½ fluid

ounces per ton of standard muriate. This heating process does not alter the chemical or physical structure of the muriate particles because the melting point of potash is about 1428 degrees Farenheit.

The M-car product has essentially the same screen analysis as the standard product. While the M-car diversion stream is running, no oil is added to the remainder of the standard stream so that it progresses through the circuit without the added oil. Approximately 75 to 80 thousand tons of standard product are sent to warehouses without the added oil; the remaining 30 percent is syphoned off in the M-car diversion. The unoiled standard product is simply placed in bins containing oiled standard. The M-car product, however, is always segregated from the standard in the warehouse.

The KCl content of muriate sent to Dumas and Fort Worth as compared to the KCl content of standard muriate sold to other customers is as follows:

|  | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| Dumas | 96.436% | 96.405% | 96.579% | 96.389% |
| Fort Worth | 96.500 | 96.452 | 96.547 | 96.468 |
| Standard | 96.389 | 96.405 | 96.452 | 96.278 |

The slight differences in KCl content of material received at Dumas and Fort Worth for conversion is explained by the absence of oil and by the fact that a greater percentage of the flotation amines are removed in the M-car heater.

The Stauffer plant at Fort Worth converts potassium chloride into potassium sulphate by the application of sulphuric acid to potassium chloride by means of the "Mannheim" process. Sulphuric acid is dripped onto the muriate which has been heated. This causes the chloride radical to be exchanged for the sulphate radical.[36] The Mannheim process uses muriate from the standard flotation circuit.

Petitioner's plant in Dumas uses the "Hargreaves" process to convert potassium chloride to potassium sulphate. During this process, the muriate is ground up, moistened, and pressed into briquettes. The briquettes are dried and placed in a series of reaction chambers lined with refractory brick. Sulphur

---

[36] A radical is an atom or element or group of atoms or elements which is the main constituent of a molecular compound and usually incapable of independent existence.

dioxide, produced by burning sulphur, is introduced into the chambers to convert potassium chloride to potassium sulphate and hydrochloric acid which is sold as a byproduct. The briquettes are then crushed or broken to produce potassium sulphate particles roughly the size of standard grade muriate.

In determining its gross income from mining, PCA used the average selling price it realized for standard muriate sold f.o.b. Carlsbad as a representative field or market price for the M-car standard muriate that it sent to Dumas and Fort Worth for sulphate conversion.

The issue for decision is whether PCA's standard grade muriate sold in Carlsbad and the muriate shipped from Carlsbad to Dumas and Fort Worth for conversion into potassium sulphate are minerals of like kind and grade so that petitioner's actual sales price (f.o.b. Carlsbad) of the muriate sold locally can be used as a representative market or field price for its shipped muriate.

The regulations provide that, if before the sale of his mineral product the miner applies nonmining processes, he is required to use the representative market or field price method where possible to compute his gross income from mining. This figure is determined by looking at competitive sales at the cutoff point of mineral products of "like kind and grade" as the miner's, and also at the miner's own sales, if any, of a mineral of like kind and grade at the cutoff point. Sec. 1.613–4(c)(1), Income Tax Regs.

Section 1.613–4(c)(2), Income Tax Regs., provides that an ore or mineral will be considered to be of a like kind and grade as the taxpayer's if:

in common commercial practice, it is sufficiently similar in chemical, mineralogical, or physical characteristics to the taxpayer's ore or mineral that it is used, or is commercially suitable for use, for essentially the same purposes as the uses to which the taxpayer's ore or mineral is put.

In determining whether the ore or mineral is of like kind and grade, reference will also be made to "industrial or commercial specifications and by consideration of chemical and physical data relating to the minerals and deposits in question."[37] A mineral may also be considered of like kind and

---

[37]Sec. 1.613–4(c)(2), Income Tax Regs.

grade even though the miner applies slightly different size reduction or beneficiation processes. And even though a miner sells or uses his mineral or ore for different purposes, this fact will not, alone, prevent another miner's ore from being classified as "like kind and grade." If the desirable natural constituents of the minerals being compared are markedly different, then, notwithstanding common suitability for commercial use, they will not be considered to be of "like kind and grade." Distinctions lacking in commercial significance, however, may be ignored. Section 1.613–4(c)(4), Income Tax Regs., provides that if:

> there is no representative market or field price for a mineral of like kind and grade as the taxpayer's, representative market or field prices for an ore or mineral which is of like kind but which is not of like grade as his ore or mineral may be used, with appropriate adjustments for differences in mineral content * * * if such adjustments are readily ascertainable. * * *

PCA argues that it is entitled to use the sales price of the standard grade muriate as a representative market or field price for the M-car standard and does not dispute that it must make adjustments in its calculation to reflect oil and amine cost differences.[38]

Respondent argues that the M-Car standard product is a "separate" and "distinct" product from the standard muriate PCA sold to customers in Carlsbad. Respondent points to two major differences in the two products. The first is the dust control oil (about 2.3 pounds per ton of muriate) added to the standard product. No dust control oil is added to the M-car product. Second, slightly more residual flotation amines (about 0.09 pounds per ton of product) are removed from the surface of the M-car product than from the standard. In support of his claim that the two products are not of like kind and grade, respondent also makes the following arguments.

First, respondent claims that there are differences in the "end use" of the two products. Section 1.613–4(c)(2), Income Tax Regs., however, states that a difference in end use will not, by itself, prevent two minerals from being classified as like kind and grade. The facts show, however, that both products

---

[38]See sec. 1.613–4(c)(4), Income Tax Regs., which permits an "appropriate adjustment for the differences in the valuable mineral content * * *, any differences in processing costs attributable to impurities, and any other relevant factors."

were used to supply the potash or potassium ingredient in the production of compound fertilizers. Furthermore, we note that the "end use" test has all but been rejected by the courts as a controlling factor in the establishment of like kind and grade. In *Bloomington Limestone Corp. v. United States*, 445 F.2d 1105, 1108 (7th Cir. 1971), the Court of Appeals held that " 'like kind' is a 'broad phrase contemplating the distinction between classes of property,' and does not permit differentiation according to the use to which the property is actually put." See also *Alabama By-Products Corp. v. Patterson*, 258 F.2d 892, 897–900 (5th Cir. 1958), cert. denied 358 U.S. 930 (1959).

In *Kaiser Steel Corp. v. United States*, 411 F.2d 335 (9th Cir. 1969), the Court of Appeals agreed with the District Court's observation that:

> Minerals are of like kind and grade if they are substantially equivalent by commercial standards. Physical, chemical, or geological differences have importance only if they are recognized in commercial competition. To determine whether two minerals are of like kind and grade, the correct standard is not whether the minerals were actually used for the same commercial purposes, but rather, whether the minerals could have been used for the same purposes in substantially identical application. [*Kaiser Steel Corp. v. United States*, an unreported case (N.D. Cal. 1966, 18 AFTR 2d 5001, 66–1 USTC par. 9457).]

Next, respondent points to the fact that the M-car product is diverted from the standard circuit just prior to the addition of oil and attempts to establish that this constitutes a separate circuit. Even if the M-car material were produced in a separate circuit, it could still be of like kind and grade. All the evidence, however, indicates that it was produced in the standard flotation circuit but syphoned off just prior to the addition of oil. Respondent also attempts to characterize the M-car's introduction into the M-car dryer as a thermal process in an effort to connote a chemical change. We do not accept this factual characterization either.

The difference in temperature in the two dryers is due to the slightly greater percentage of amines sought to be removed. This process does not alter the chemical or physical structure of the muriate any more than the standard product dryers

do.[39] The melting point of potash is significantly higher. It must also be pointed out that the removal of slightly more amines and the omission of dust control oil are just the sort of "appropriate adjustments" which the regulations contemplate. Sec. 1.613–4(c)(4), Income Tax Regs.

Finally, respondent claims, in general, that the two products are separate and distinct and, therefore, cannot be of like kind and grade. We disagree. Numerous judicial decisions have established that "a representative market or field price need not be based upon comparisons among virtually identical products." *Bloomington Limestone Corp. v. United States, supra.* A constructive price determination based upon comparisons necessarily means that the products being compared will not be identical. Nor do the regulations support a contrary conclusion.

Based upon the foregoing discussion, we find that petitioner's M-car and standard product are sufficiently similar in chemical, mineralogical, and physical characteristics so as to be considered of like kind and grade. PCA may, therefore, use the f.o.b. mine selling price of the standard grade muriate as the representative market price of M-car muriate with appropriate adjustments for the oil and amines.

## Issue 5. Cost of Leasing Railcars

PCA has no railcars of its own. Railroad hopper cars are necessary for the shipment of small particles in bulk such as potash. Almost all of PCA's customers are manufacturers who demand bulk shipments requiring hopper cars. Although the railroads provide some hopper cars, they cannot supply a number adequate to meet PCA's demand. In order to insure a sufficient supply, during each of the taxable years, PCA leased hopper cars from North American Car Corp. (North American) and made them available to the railroads for transporting muriate to PCA's customers. North American is independent of petitioner, and there is no ownership or control by North

---

[39]Apparently respondent would like us to find that the application of oil and amines is a nonmining process. We decline to do so. They were treated as mining costs in the statutory notice and were not directly challenged by respondent. The issue bears only upon our determination as to whether the two products are of like kind and grade.

American of petitioner or by petitioner of North American. This practice is common to all potash producers.

The arm's-length agreement between PCA and North American provided for monthly payments representing the base rentals for the cars less "earned mileage." "Earned mileage" is paid to North American by the railroad for the railroad's use of North American's railcars leased to PCA and used by the railroad instead of its own cars. Earned mileage is governed by railroad rules and tariffs filed with the U.S. Interstate Commerce Commission and the Canadian Transport Commission. Subject to all the rules and tariffs, North American contracted with PCA to credit its rental account with the mileage earned by the cars and collected from the railroads. North American provided monthly reports of the earned mileage to PCA. Mileage earned is based upon established mileage rates and the number of miles traveled.

The mileage earned credited to PCA's account by North American could not exceed the aggregate monthly rentals for the term of the agreement. North American was entitled to any excess. The rental was set high enough so that some net rental payment was always due. North American abated the rentals for periods of nonuse (repairs, out of service) through "rental credits" applied to the leasing account. Petitioner's rental payments for leased railway cars during 1971–74 were calculated in the following manner:

*Leased Car Rental Costs: 1971–74*

|                     | 1971         | 1972          | 1973         | 1974         |
|---------------------|--------------|---------------|--------------|--------------|
| Gross rent          | $353,906.78  | $596,351.62   | $487,875.10  | $517,907.70  |
| Less rental credits | (35,515.81)  | (129,537.51)  | (74,874.25)  | (128,374.35) |
| Gross expense       | 318,390.97   | 466,814.11    | 413,000.85   | 389,533.35   |
| Less mileage earned | (225,954.01) | (228,887.15)  | (255,070.71) | (195,015.56) |
| Net payments        | 92,436.96    | 237,926.96    | 157,930.14   | 194,517.79   |

The rental cost which PCA was charged and obligated to pay to North American was the stated rental (less credits) minus offsetting mileage allowances which North American was contractually bound to apply to reduce the stated rental. The net rentals are allocated as follows:

|  | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| Saskatoon | $24,376 | $111,325 | $115,573 | $180,298 |
| Carlsbad (to customer) | 55,712 | 113,277 | 38,314 | 11,846 |
| Carlsbad (to Dumas) | 12,349 | 13,324 | 4,043 | 2,374 |
|  | 92,437 | 237,926 | 157,930 | 194,518 |

PCA has better control over the availability of leased cars than it does over those owned by the railroads (system cars). Further, the railroads have an inadequate number of system cars to meet PCA's needs. PCA leases the railroad cars annually in order to facilitate sales of muriate to its customers. It is essentially a service PCA provides to its customers. By leasing additional railcars, PCA avoids delays which would otherwise result if it relied solely upon railroad owned cars. This results in increased total annual sales and shipments. The stated sales price of muriate sold at Carlsbad or Saskatoon was the same whether the railroad transported the muriate in system cars or in leased cars.

The Canadian Pacific Railroad, the Atchison, Topeka, & Santa Fe Railroad, and the other common carrier railroads used by petitioner to transport potash to its customers are independent of petitioner, and there is no ownership or control by such railroads of petitioner or by petitioner of such railroads. PCA's payments to the railroads of the applicable railroad tariffs are for transportation services rendered by the railroads as independent contractors.

During the 1971–74 period, PCA's total railcar shipments of muriate from Carlsbad and Saskatoon (both in leased and system railroad cars and including prepaid and collect shipments) were as follows:

*Total Shipments (in number of railcars)*

|  | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| Carlsbad to customers | 9,505 | 9,316 | 9,620 | 8,515 |
| Carlsbad to Dumas | 219 | 221 | 217 | 198 |
| Carlsbad to Fort Worth | 229 | 170 | 218 | 214 |
| Saskatoon (domestic) | 2,662 | 2,986 | 4,532 | 6,059 |
| Saskatoon (export) | 1,850 | 1,145 | 1,466 | 1,854 |
| Total | 14,465 | 13,838 | 16,053 | 16,840 |

During the 1971–74 period, PCA's railcar shipments of muriate from Carlsbad and Saskatoon in leased cars (including

both prepaid and collect shipments) were as follows (these numbers are included in the figures in the preceding paragraph):

*Shipments in Leased Cars (in number of railcars)*

|  | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| Carlsbad to customers | 352 | 868 | 360 | 65 |
| Carlsbad to Dumas | 79 | 105 | 38 | 13 |
| Carlsbad to Fort Worth | 0 | 0 | 0 | 0 |
| Saskatoon (domestic) | 217 | 553 | 615 | 956 |
| Saskatoon (export) | 136 | 253 | 383 | 7 |
| Total | 784 | 1,779 | 1,396 | 1,041 |

In his notice of deficiency, the Commissioner determined that PCA's costs of leasing railcars were nonmining costs and included them in the denominator of the proportionate profits fraction. Respondent's adjustment was based upon an assumption that petitioner would be required to compute its gross income from mining by the proportionate profits method.

Since we have concluded that petitioner is entitled to use a representative market or field price based upon its actual f.o.b. mine sales price, we must reject respondent's premise. Respondent apparently did not consider the leasing costs in light of this contingency and did not argue the issue on brief; we, therefore, conclude that he has conceded it. *Stemkowski v. Commissioner*, 76 T.C. 252, 312 (1981), affd. in part, revd. and remanded in part 690 F.2d 40 (2d Cir. 1982). Petitioner is entitled to compute its percentage depletion based upon its f.o.b. mine price. *North Carolina Granite Corp. v. Commissioner*, 43 T.C. 149, 159 (1964).

### Issue 6. Prepaid Freight and "Purchased Transportation to the Customer"

Petitioner sells its domestic muriate f.o.b. mine. During the taxable years in issue, virtually all of PCA's muriate was shipped from its mines by common carrier railroads. This muriate was transported either in railroad "system cars" or in railcars leased by PCA from an independent third party and then made available to the railroads. It was shipped either freight collect or freight prepaid.

Respondent challenged only prepaid freight charges on shipments of muriate in leased railcars. Since we have concluded that the leasing of the cars is not an issue, we deal here only with the proper method by which PCA may compute its "gross income from mining" from domestic and export sales of muriate.

When muriate is shipped by rail "freight collect," the freight charges are paid by the customer directly to the railway when the muriate reaches its destination. In these cases, muriate is shipped on a bill of lading which requires the freight charges to be collected by the railroad before it releases the goods to the customer. When this occurs, PCA does not advance or collect the freight charges, nor are these freight charges reflected in its financial records of income and expense. These freight charges are not in issue here.

The freight charges established for the transport of muriate by regulated common carriers were fixed rates equally applicable to all similarly situated producers of potash near Carlsbad and Saskatoon. The railroads' freight tariffs were the same for prepaid shipments as for collect shipments. These freight charges were for muriate shipped to customers and did not include muriate shipped from Carlsbad to Dumas and Fort Worth for conversion into potassium sulphate.

The freight charges are characterized in the statutory notice as "cost to haul leased cars" but are actually railroad charges for transporting muriate in railcars. These charges depend upon the tonnage, nature, and bulk of the products transported (in addition to the destination).

PCA passed through to its customers the prepaid freight charges it paid to the railroads in order for the railroads to transport muriate to customers prepaid. Accordingly, the prepaid freight paid by PCA to the railroads (for shipments in both leased and system cars) equaled the amount of prepaid freight collected by PCA from its customers for such shipments.

All Carlsbad muriate sold for export, and in issue here, was transported by rail to Long Beach or San Diego, Calif. During the years 1971–74, substantially all of PCA's export sales of potash from Carlsbad were handled through International Ore & Fertilizer Corp. (Interore), an independent exporting corpo-

ration having its principal office and place of business in New York City.

From 1971 until mid-1973, Interore also handled substantially all of PCA's export shipments from Saskatoon. From mid-1973 through 1974, PCA's export shipments from Saskatoon were generally handled through Canadian Potash Producers Association, an independent organization established to comply with the Saskatoon potash production quotas.

PCA generally invoiced Interore at the port or vessel, although such invoices from Saskatoon nearly always stated the inland freight charge separately and the Carlsbad invoices sometimes stated the inland freight as a separate item. The export prices negotiated by PCA were done on the basis of a competitive mine price plus inland freight to the port city, stevedoring, and other similar charges. PCA recorded its export sales in its sales account in an amount equal to the port or vessel price after subtracting inland freight and loading at the port (where the sale was at vessel rather than car at port).

In his notice of deficiency, the Commissioner determined that the freight charges PCA prepaid to the railroads to transport muriate to customers (or, in the case of exports, to the port cities) in leased cars were nonmining costs of PCA. In his computation of PCA's percentage depletion allowance using the proportionate profits method, the Commissioner included in "gross income from the sale of PCA's first marketable product or group of products" the amounts PCA collected from its customers for prepaid freight. The basis for this determination was that these sales were not sold f.o.b. mine but were sold at a delivered price at the customer's place of business.

The next issue for our decision is where petitioner's passed-through freight charges fit into its computation of gross income from mining.

Respondent's adjustment, which would classify petitioner's transportation in leased cars as a nonmining cost and force PCA to use the proportionate profits method, is based upon the assumptions that PCA's sales were not sold f.o.b. mine but, rather, were sold at a delivered price at the customer's place of business, and PCA's domestic transportation in leased cars would not qualify as purchased transportation to the customer. We have found that PCA's domestic sales were f.o.b. mine.

Hence, domestic transportation costs occurred after the point of sale.

A miner may treat the proceeds realized from the sale of his mineral product as gross income from mining only "After application of only mining processes, including mining transportation, *and before any* nonmining transportation." (Emphasis added.) Sec. 1.613–4(b)(1)(ii), Income Tax Regs. Petitioner, therefore, may compute its gross income from mining for domestic sales of muriate based upon the actual f.o.b. mine sales receipts.

In the case of PCA's foreign sales which are on an f.o.b. port or vessel basis, petitioner may compute gross income from mining by using a representative market or field price since both products are identical. Section 1.613–4(c)(1), Income Tax Regs., provides that:

If the taxpayer processes the ore or mineral before sale by the application or nonmining processes (including nonmining transportation) * * * gross income from mining shall be computed by use of the representative market or field price of an ore or mineral of like kind and grade as the taxpayer's ore or mineral after the application of the mining processes actually applied * * * and before any nonmining transportation, subject to any adjustments required by paragraph (e)(1) of this section. See paragraph (e)(2)(i) of this section for certain other situations in which this paragraph shall apply. * * *

In petitioner's case, section 1.613–4(e)(2)(i), Income Tax Regs., provides that:

A taxpayer who computes gross income from mining under the provisions of paragraph (c) of this section and who sells his ore or mineral after the application of only mining processes but after nonmining transportation shall use as the representative market or field price his delivered price (if otherwise representative) reduced by costs paid or incurred by him for purchased transportation to the customer * * *

Purchased transportation to the customer means, in general:

nonmining transportation of the taxpayer's minerals or mineral products to the customer—
   (a) Which is not performed in conveyances owned or leased directly or indirectly, in whole or in part, by the taxpayer,
   (b) Which is performed solely to deliver the taxpayer's minerals or mineral products to the customer, rather than to transport such minerals or products for packaging or other additional processing by the taxpayer (other than incidental storage or handling), and

(c) With respect to which the taxpayer ordinarily does not earn any profit. [Sec. 1.613–4(e)(2)(iii), Income Tax Regs.]

There are a number of cases which support our conclusion as to PCA's export sales. *Zonolite Co. v. United States*, 211 F.2d 508 (7th Cir. 1954); *Ayers Materials Co. v. Commissioner*, 62 T.C. 557, 562 (1974); *Utah Alloy Ores, Inc. v. Commissioner*, 33 T.C. 917 (1960); *Winnsboro Granite Corp. v. Commissioner*, 32 T.C. 974 (1959), affd. per curiam 283 F.2d 307 (4th Cir. 1960). Accordingly, we hold that petitioner is not required to use the proportionate profits method to compute its percentage depletion allowance and may, instead, use the actual f.o.b. mine sales price for its domestic muriate and the delivered price reduced by "purchased transportation" for its exported muriate.

## *Issue 7. Interest*

During taxable years 1973 and 1974, PCA incurred interest expenses and realized interest income in connection with its cement operations. Before and during the heavy shipping season (summer), PCA needed large amounts of cash because the seasonal demand for cement necessitated large increases in inventory and accounts receivable. As a matter of business policy, PCA chose not to draw upon its open line of bank credit on a frequent basis. Each spring, therefore, when the need for additional cash arose, it would borrow sufficient funds on its open line of credit to satisfy its needs for several months. Funds borrowed but not needed immediately were reinvested in short-term, highly liquid commercial paper to reduce the cost of holding the borrowed funds until they were actually needed.

During the same 2 taxable years, PCA also incurred interest expense with respect to certain revenue bonds issued on PCA's behalf by various Government entities. After these bonds were issued, the proceeds were held by a trustee until they were authorized to be released to PCA under the terms of the relevant bond agreement. Prior to their release, the proceeds were reinvested by the trustee in short-term investments to reduce the cost of holding the borrowed funds.

During these same 2 taxable years, PCA also incurred interest expense and interest income from various miscellaneous loans and investments.

During the taxable years 1973 and 1974, in computing its taxable income from mining, petitioner offset its deductible interest expense with interest income it realized on investments in Treasury bills and commercial paper during those years.

In his notice of deficiency, the Commissioner required PCA to reduce its taxable income from mining by the entire amount of its interest expense without the offset for interest income.

The final issue for our decision is whether in determining its expenses for purposes of calculating the "50 percent on taxable income from the property" limitation on percentage depletion, PCA may reduce its interest expenses by its interest income.[40]

A taxpayer, pursuant to section 613, is generally entitled to a deduction for percentage depletion with respect to a mining property in an amount equal to a fixed percentage of its "gross income from the property," less rents or royalties paid by the taxpayer. This deduction, however, is limited to "50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." This calculation, therefore, consists of two distinct steps. First, gross income from the property must be calculated. Second, "taxable income from the property" must be calculated.

The parties are in agreement as to the first step—the calculation of gross income derived from PCA's cement operations and the applicable percentage by which this amount is multiplied. The dispute, rather, centers on the second step of the depletion calculation—the limitation on the amount of the depletion to 50 percent of "taxable income from the property."

For purposes of calculating taxable income from the property, section 1.613-5(a), Income Tax Regs., requires that "gross income from the property" be reduced, inter alia, by a portion of a taxpayer's "financial overhead" expense allocable to mining processes. The term "financial overhead" is not defined by the regulation, but there is no dispute between the parties regarding the allocation of financial overhead. Rather

---

[40]This issue arises in connection with the calculation of percentage depletion on petitioner's cement properties, and is unrelated to the preceding issues involving potash depletion.

the disagreement is as to how financial overhead should be calculated.

Respondent contends that financial overhead includes the total interest expense incurred during the year. PCA, however, maintains that financial overhead is properly calculated by reducing interest expense incurred during the year by the amount of interest income realized during the year. We agree with petitioner.

Respondent's persistent reliance upon our decision in *Island Creek Coal Co. v. Commissioner*, 30 T.C. 370 (1958), is misplaced. In that case, the taxpayer realized income from the sale of certain scrap items including steel and wire. The particular facts of that case indicated that the scrap salvage operation was essentially a separate business, extraneous to the mining operation. We reject any implication that a technical income item can never offset an expense item.

In the recent case of *General Portland Cement Co. v. United States*, 628 F.2d 321 (5th Cir. 1980), cert. denied 450 U.S. 983 (1981), the Court of Appeals for the Fifth Circuit had before it the issue of whether the taxpayer could reduce its interest expense deduction by the amount of interest income earned on taxpayer-issued debentures and short-term investments in Treasury bills and commercial paper for purposes of computing the 50-percent limitation on percentage depletion. The court concluded:

We think the purpose behind the "50% limit" argues in favor of the taxpayer in the instant case. We believe that purpose is served by subtracting the *actual* cost of interest, rather than an inflated amount. Taxpayer's actual cost of interest is its "net" interest expense. * * *

\* \* \* \* \* \* \*

We hold that taxpayer's actual interest cost is the net amount, and that taxpayer can offset its interest income against its interest expense in calculating "taxable income from the property" for purposes of the "50% limit." [628 F.2d at 344.]

We hold for petitioner on this issue.

*Decision will be entered under Rule 155.*