RUBEN KHOTOVELI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Khotoveli v. Commissioner
Docket No. 10880-89
United States Tax Court
T.C. Memo 1992-405; 1992 Tax Ct. Memo LEXIS 427; 64 T.C.M. (CCH) 187; July 16, 1992, Filed *427 Decision will be entered under Rule 155. For Petitioner: Maurice Abrams. For Respondent: Andrew J. Mandell. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in, and additions to, petitioner's Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
50% interest on:
1984
$  1,557
$    779
$  1,557
-0- 1985
18,424
9,212
18,424
$ 4,606
All section references are to the Internal Revenue Code as amended. There are four issues for decision. First, whether petitioner failed to report income totaling $ 10,250 in 1984 and $ 60,246 in 1985, or whether such amounts are gifts from petitioner's father to petitioner's two children. Second, if there is an underpayment of petitioner's tax for either of the 2 years at issue, whether any part of it is due to fraud. Third, whether there is a substantial understatement of petitioner's income tax for taxable year 1985 within the meaning of section 6661. Fourth, whether petitioner has "averageable income" for taxable year 1985 within the meaning of section 1302(a), and is eligible for the limitation *428 on tax prescribed by section 1301. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The First Stipulation For Trial, the Second Stipulation for Trial, and the exhibits attached thereto are hereby incorporated in this opinion. Petitioner resided in Brooklyn, New York at the time he filed his petition in this case. Petitioner was born on September 12, 1940, in Kutasi, Georgia, in the former Soviet Union. Petitioner's father, Mr. Jacob Khotoveli, operated a shoe factory and sold agricultural products. He also owned or operated an inn. During the time petitioner lived in Kutasi, he worked with his father and was employed as an amateur boxer. In 1972, petitioner's family sold their property in Kutasi and moved to Israel. Petitioner remained in Israel for only approximately 6 months before moving to Italy and then to Detroit, Michigan. He arrived in Detroit on March 25, 1974, and worked as a cook and then as a "seat-cutter" for General Motors. After approximately 3 or 4 years, he moved to New York City. Petitioner's father was born on May 10, 1907. He was 77 and 78 years of age during the years in issue. He has resided in the State of Israel since October *429 1972 when he left Kutasi, Georgia. Petitioner has at least two children, Ruth and Jacob. Ruth was born on May 14, 1972, and lives in Israel. Jacob was born in 1980 and lives with petitioner in New York City. There is evidence in the record that petitioner has a second son, Moshe, who was born in 1986 and lives with him in New York. The record in this case does not disclose when petitioner was married or for how long, but it does reveal that petitioner was not married at any time during 1982 through and including 1985. Nevertheless, petitioner claimed "married filing joint return" filing status on his Federal income tax returns for 1982 and 1983. Both returns state "Rubin & Jane Khotoveli" in the space provided for the taxpayer's name. They both contain an entry in the space provided for "spouse's social security no." They both claim personal exemptions for the taxpayer and his "spouse". Finally, in the signature block of both returns, there appears the name "Khotoveli" in handwriting above the line provided for "spouse's signature". In 1981 or 1982, petitioner purchased a restaurant located in the Borough of Queens. The restaurant was called "Georgia from Jerusalem". After *430 approximately 1 year, petitioner sold the restaurant for approximately $ 8,000. In 1983, petitioner purchased the stock of a corporation which owned another restaurant, Primorski Restaurant, Inc. He paid between $ 6,000 and $ 10,000 for the stock. During 1984 and 1985, petitioner was the president and sole shareholder of Primorski Restaurant, Inc. His sole business was the operation of Primorski Restaurant. Primorski Restaurant has approximately 1,200 square feet of floor space and has seating capacity for approximately 65 people. During 1984 and 1985, it was open 6 days per week from 11:00 a.m. to, at least, 10:00 p.m. Petitioner spent all of his working time at the restaurant. He cooked, washed dishes, and did any other job that was necessary. During the taxable years 1984 and 1985, Primorski Restaurant, Inc. maintained no bank accounts. It conducted all of its business transactions in cash. During those years, Primorski Restaurant, Inc. paid the following expenses: Description
1984
1985
Rent at $ 1,719.25 per month
$ 20,631
--  Rent at $ 1,844.25 per month
--  $ 22,131
Salary for musician
7,200
7,200
Salary for cook
15,600
15,600
Electricity
12,000
12,000
Gas
3,000
3,000
Insurance
4,000
4,000
Dishes
1,200
1,200
Total
$ 63,631
$ 65,131
*431 Petitioner reported receiving salaries and wages from Primorski Restaurant, Inc. in the amount of $ 5,750 during 1984 and $ 6,048 during 1985. If petitioner's salary is added to the above amounts paid to the musician and cook, then it appears Primorski Restaurant, Inc. paid total salaries and wages during 1984 and 1985 of at least $ 28,550 and $ 29,848, respectively. For 1984, Primorski Restaurant, Inc. filed four Employer's Quarterly Federal Tax Returns on Forms 941 on behalf of Primorski Restaurant, Inc. which report "Total wages and tips subject to withholding, plus other compensation" in the aggregate amount of $ 7,750. Petitioners also filed Employer's Annual Federal Unemployment (FUTA) Tax Return on Form 940 for 1984 which reports "Total payments (including exempt payments) during the calendar year for services of employees" in the amount of $ 7,750. For 1985, petitioners filed four Employer's Quarterly Federal Tax Returns on Forms 941 on behalf of Primorski Restaurant, Inc. which report "Total wages and tips subject to withholding, plus other compensation" in the aggregate amount of $ 8,000. Petitioner also filed Employer's Annual Unemployment (FUTA) Tax Return on Form *432 940 for 1985 which reports "Total payments (including exempt payments) during the calendar year for services of employees" in the amount of $ 8,000. No income tax returns were filed by, or on behalf of, Primorski Restaurant, Inc. for fiscal years ending March 31, 1984, March 31, 1985, or March 31, 1986. The revenue agent who audited petitioner's returns for calendar years 1984 and 1985 also audited Primorski Restaurant, Inc. for fiscal years ending March 31, 1985, and March 31, 1986. Respondent's agent asked the corporation's representative, Mr. Harold Wapnick, for the corporation's books and records. Mr. Wapnick informed respondent's agent that Primorski Restaurant, Inc. had no books or records and no books and records were provided to the agent. Petitioner filed quarterly sales and use tax returns for Primorski Restaurant, Inc. with the New York State Department of Taxation and Finance on forms supplied by that department. The nine quarterly returns which he filed over the course of the period beginning December 1, 1983, and ending February 28, 1986, report taxable sales and services and sales tax in the following amounts: New York State Sales and Use Tax Returns
Taxable Sales
Sales
Quarter
and Services
Tax
12/01/83 -
2/29/84
$ 1,939
$ 159.96
3/01/84 -
5/31/84
2,425
200.06
6/01/84 -
8/31/84
2,545
209.96
9/01/84 -
11/30/84
2,727
224.97
12/01/84 -
2/28/85
2,848
234.96
3/01/85 -
5/31/85
3,054
351.95
6/01/85 -
8/31/85
3,393
279.92
9/01/85 -
11/30/85
3,497
288.50
12/01/85 -
2/28/86
3,624
298.98
*433 At trial, petitioner sought the admission of a document entitled "Stipulation for Discontinuance of Proceeding" which purports to show that a petition for redetermination of a New York State sales tax deficiency for the period "6/11/84 - 5/31/87", filed on behalf of "Primorski Restaurant, Inc. and Buba Khotoveli, Officer", was discontinued and the deficiency was recomputed to $ 10,000 in tax and $ 8,279.14 in interest. Respondent objected to the document and argued that its admission into evidence would violate Federal Rule of Evidence 408, relating to compromise and offers to compromise, and on the ground that the document constitutes hearsay under Federal Rule of Evidence 802. We sustain respondent's hearsay objection. On brief, petitioner argues that the Stipulation for Discontinuance is not hearsay because it is covered by the public records and reports exception to the hearsay rule, Federal Rule of Evidence 803(8). However, the record contains no foundation for the application of that exception. During the years in issue, 1984 and 1985, petitioner opened one savings account at Anchor Savings Bank and three savings accounts at Flatbush Savings and Loan Association. The *434 account at Anchor Savings Bank was opened on May 29, 1984, in petitioner's name. During 1984 and 1985, the records of Anchor Savings Bank show the following deposits to, withdrawals from, and interest credits to the account: Anchor Savings Bank
Date
Deposit
Withdrawal
Interest
Balance
5/29/84
$    250.00
--    -- $   250.00
6/29/84
--   --    $ 1.26
251.26
9/28/84
--   --    3.56
254.82
11/15/84
7,245.36
--    -- 7,500.18
11/26/84
1,770.00
--    -- 9,270.18
12/18/84
--   <$  9,000.00>
-- 270.18
12/31/84
--   --    46.31
316.49
2/06/85
1,846.00
--    -- 2,162.49
3/29/85
--   --    19.67
2,182.16
4/16/85
--   <1,600.00>
-- 582.16
6/28/85
--   --    11.86
594.02
9/30/85
--   --    8.41
602.43
12/31/85
--   --    8.53
610.96
Total   $ 11,111.36
<$ 10,600.00>
$ 99.60
Yearly Totals 1984  $ 9,265.36
<$ 9,000.00>
$ 51.13 1985  $ 1,846.00
<$ 1,600.00>
$ 48.47 The first account at Flatbush Savings and Loan Association, number 208, was opened on December 18, 1984, with a deposit consisting of $ 7,200 in cash and a check for $ 2,800 for a total deposit of $ 10,000. *435 (We have not used the full account number of any of the bank accounts at issue in this case but only enough of the number to identify it and avoid confusion.) The account was titled in the name, "Ruben Khotoveli, as custodian for Jacob Khotoveli, a minor, under the New York State Uniform Gift to Minors Act". During 1984 and 1985, the records of Flatbush Federal Savings and Loan Association show the following deposits to, withdrawals from, and interest credits to the account: Flatbush Savings and Loan Association, Account No. 208
Date
Deposit
Withdrawal
Interest
Balance
12/18/84
$ 10,000.00
--
--  $ 10,000.00
12/31/84
--
--
$ 36.44
10,036.44
1/31/85
--
--
80.68
10,117.12
2/28/85
--
--
72.88
10,190.00
3/31/85
--
--
80.68
10,270.68
4/30/85
--
--
78.08
10,348.76
5/31/85
--
--
80.68
10,429.44
6/18/85
--
--
44.25
10,473.69
6/30/85
--
--
29.88
10,503.57
7/31/85
--
--
71.60
10,575.17
8/31/85
--
--
72.09
10,647.26
9/30/85
--
--
70.23
10,717.49
10/31/85
--
--
73.06
10,790.55
11/30/85
--
--
71.18
10,861.73
12/18/85
--
--
40.54
10,902.27
12/31/85
--
--
32.03
10,934.30
Total   $ 10,000.00 -- $ 934.30
Yearly Totals 1984  $ 10,000.00
$ 36.44
1985  --
$ 897.86
*436 The second savings account at Flatbush Savings and Loan Association, number 924, was opened on April 12, 1985. The account was titled in the name, "Ruben Khotoveli, as custodian for Ruth Khotoveli, a minor,under the New York State Uniform Gift to Minors Act". The records of the Flatbush Savings and Loan Association show the following deposits to, withdrawals from, and interest credits to the account during 1985: Flatbush Savings and Loan Association, Account No. 924
Date
Deposit
Withdrawal
Interest
Balance
4/12/85
$ 18,000.00
--
--   $ 18,000.00
4/16/85
18,000.00
--
--   36,000.00
4/30/85
--    --
$   137.96
36,137.96
5/03/85
7,000.00
--
--   43,137.96
5/31/85
--    --
291.90
43,429.86
6/04/85
4,000.00
--
--   47,429.86
6/30/85
--    --
295.19
47,725.05
7/10/85
3,000.00
--
--   50,725.05
7/31/85
--    --
305.33
51,030.38
8/31/85
--    --
305.22
51,335.60
9/30/85
--    --
296.18
51,631.78
10/31/85
--    --
311.12
51,942.90
11/30/85
--    --
303.98
52,246.88
12/31/85
--    --
315.98
52,562.86
Total
$ 50,000.00
--
$ 2,562.86
Finally, the third savings account at Flatbush Federal *437 Savings and Loan Association, number 970, was opened on June 28, 1985. The account was titled in the name, "Ruben Khotoveli as custodian for Jacob Khotoveli, a minor, under the New York State Uniform Gift to Minors Act". On that date, $ 10,000 was deposited into the account in cash. The records of the Flatbush Savings and Loan Association show the following deposits to, withdrawals from, and interest credits to the account during 1985: Flatbush Savings and Loan Association Account No. 970
Date
Deposit
Withdrawal
Interest
Balance
6/28/85
$ 10,000.00
--
--  $ 10,000.00
7/31/85
--
--
$  67.44
10,067.44
8/31/85
--
--
60.21
10,127.65
9/30/85
--
--
58.43
10,186.08
10/31/85
--
--
61.38
10,247.46
11/30/85
--
--
59.97
10,307.43
12/31/85
--
--
62.34
10,369.77
Total
$ 10,000.00
--
$ 369.77
As shown above, during 1984 and 1985, peitioner deposited a total of $ 70,000 into the three accounts at Flatbush Federal Savings and Loan Association. The breakdown of each deposit for the three accounts between cash and check is as follows: Date
Cash
Check
Total Deposit
12/18/84
$ 7,200
$ 2,800
$ 10,000
4/12/85
9,000
9,000
18,000
4/16/85
9,000
9,000
18,000
5/03/85
7,000
--  7,000
6/04/85
4,000
--  4,000
6/28/85
10,000
--  10,000
7/10/85
3,000
--  3,000
Total $ 49,200
$ 20,800
$ 70,000
*438 Petitioner deposited none of the salary and wages reported on his income tax returns for 1984 or 1985 into any bank account. None of the above deposits were from loans, inheritances, legacies, or devises. The cash portion of each of the above deposits was composed of currency in the following denominations: Date
100's
50's
20's
10's
Total
12/18/84
40
36
70
0
$ 7,200
1984 Total
40
36
70
0
$ 7,200
4/12/85
74
32
0
0
$ 9,000
4/16/85
66
48
0
0
9,000
5/03/85
2
16
293
14
7,000
6/04/85
0
0
200
0
4,000
6/28/85
0
0
500
0
10,000
7/10/85
0
0
150
0
3,000
1985 Total
142
96
1,143
14
$ 42,000
Grand Total
182
132
1,213
14
$ 49,200
OPINION
During 1984, petitioner deposited $ 19,265.36 into two bank accounts, one account at Anchor Savings Bank and a second account at Flatbush Savings and Loan Association, number 208. During 1985, petitioner deposited $ 61,846 into three bank accounts, the same account at Anchor Savings Bank and two different accounts at Flatbush Federal Savings and Loan Association, account numbers 924 and 970. Therefore, during 1984 and 1985, petitoner made aggregate deposits of $ 81,111.36 into four *439 bank accounts.
After eliminating transfers between accounts, respondent determined that $ 70,496 of the total deposits constitutes income which petitioner failed to report during 1984 and 1985, as follows: 1984
1985
Anchor Savings Bank
$ 250
$ 246
Flatbush Account No. 208
10,000
-- Flatbush Account No. 924
--  50,000
Flatbush Account No. 970
--  10,000
$ 10,250
$ 60,246
Petitioner did not seek to explain at trial, and has not sought to explain in his post-trial briefs, the deposits made to his personal account at Anchor Savings Bank in the amount of $ 250 in 1984 and $ 246 in 1985. Accordingly, we hereby sustain respondent's determination that those amounts constitute unreported income to petitioner. 1. Whether petitioner failed to report income in 1984 and 1985.
The first issue for dicision is whether respondent correctly determined that the remaining amounts deposited into the three accounts at Flatbush Savings and Loan Association, in the aggregate amount of $ 10,000 in 1984 and $ 60,000 in 1985, are additional income to petitioner. We note that respondent did not treat the interest earned on the subject bank accounts as petitioner's income. *440 The accounts are titled in petitioner's name "as custodian for" his children, and respondent apparently concedes that petitioner does not own the accounts. This first issue turns on the source of the seven deposits totaling $ 70,000 which were made during the 2 years in issue. Respondent asserts that the likely source of all of those deposits is petitioner's restaurant business. Petitioner claims that the money came from his father. Petitioner's trial memorandum sets forth this contention as follows: That Jacob Khotoveli is the father of the petitioner and the grandfather of Ruth and Jacob Khotoveli. On 4-12-85, he brought $ 50,000 to the US and instructed petitioner to establish an account for Ruth, and brought $ 10,000 for Jacob. On 12-18-84 he asked his cousin, Simon Khotoveli to bring $ 10,000 to the US for Jacob. That due to his occupation in the USSR prior to coming to Israel, and properties owned in the USSR and Israel, that he possessed the financial capability to make the above gifts.
Petitioner bears the burden of proving that respondent erred in computing the underlying tax deficiencies by treating the amount of the subject deposits, $ 10,000 in 1984 and $ *441 60,000 in 1985, as additional income to petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure (hereafter all Rule references are to the Tax Court Rules of Practice and Procedure); Parks v. Commissioner, 94 T.C. 654, 658 (1990).
As described above, petitioner claims that all of the moneys which comprise the subject deposits were supplied by his father. Petitioner claims that the deposit made on December 18, 1984, in the amount of $ 10,000, was made with the U.S. currency which Mr. Simon Khotoveli brought when he came to the United States from Israel. Petitioner claims that petitioner's father gave the money to Mr. Khotoveli, his cousin, with instructions that it was to be a gift for petitioner's son, Jacob. Petitioner did not prove this contention at trial. For example, petitioner did not prove that Mr. Khotoveli was present in the United States on or before December 18, 1984. Petitioner's testimony on this point is vague. He was asked, on direct, to state when Mr. Khotoveli came to the United States and petitioner responded as follows: A [As translated:] He said he was, he said here when he brought the $ 20,000.00 for his child, 10 or 20 thousand. *442 $ 10,000.00 he brought for his child. He came here when he brought the $ 10,000.00.
Q Do you recall when he came here? [Translation follows.]
A [As translated:] Before he opened the amount in the bank in Jacob's name.
Similarly, Mr. Jacob Khotoveli's deposition on written interrogatories does not establish when Mr. Khotoveli was present in the United States. Petitioner's father simply answered "yes" to the following question: On or about Dec. 18, 1984, did you ask your cousin Simon Khotoveli to bring $ 10,000 in cash US for Jacob? December 18, 1984, of course, is the date of the deposit to account number 208 at Flatbush Savings and Loan Association. Thus, strictly speaking, the deposition of petitioner's father serves to disprove, rather than prove, that Mr. Khahiashvili was in the United States on that date. An employee of Flatbush Savings and Loan Association testified that petitioner's father was present in the bank when she opened the account on December 18, 1984. She identified a photograph of petitioner's father and she testified that he was present on December 18, 1984, and April 12, 1985, when she opened account numbers 208 and 924. However, if petitioner's *443 father was present on December 18, 1984, when the first account (number 208) was opened, then petitioner's explanation that his father gave Mr. Khahiashvili $ 10,000 in cash to bring to the United States makes no sense. Petitioner has not attempted to explain this discrepancy. We note that Mr. Khahiashvili did not testify at trial, and petitioner did not seek to take Mr. Khahiashvili's deposition upon written questions, pursuant to Rule 84, as he did in the case of his father. At the close of trial, there was no documentary evidence in the record to establish that Mr. Khahiashvili had come to the United States on or before December 18, 1984. Therefore, on petitioner's motion which respondent did not oppose, the Court granted petitioner leave to submit a complete copy of Mr. Khahiashvili's passport on the condition that it would be certified by an official of the U.S. Embassy in Israel. Thereafter, petitioner submitted a document which purports to be a copy of Mr. Khahiashvili's passport. However, the document was not certified by an official of the U.S. Embassy in Israel, and it is not complete because pages are omitted. For those reasons, we will deny petitioner's motion to *444 accept the document into evidence. Nevertheless, we have reviewed Mr. Khahiashvili's alleged passport which is attached to petitioner's Reply Regarding Admissibility of Passport of Simon Khahiashvili. We find that it raises more questions than it answers. It shows that a nonimmigrant visa was issued by the United States Embassy in Tel Aviv on December 3, 1984, to be valid until March 3, 1985. It also contains a stamp, "U.S. Immigration, New York, NY", which suggests that Mr. Khahiashvili was admitted to the United States on "January 13, 1985". However, we are unable to find evidence that Mr. Khahiashvili was present in the United States on December 18, 1984, as claimed by petitioner. Furthermore, the alleged passport shows that Mr. Khahiashvili frequently traveled between Israel and the United States. In fact, on November 20, 1987, he was issued a nonimmigrant visa by the United States which was valid "indefinitely". It further appears that Mr. Khahiashvili entered the United States only 2-1/2 months prior to the trial in this case. The alleged passport, therefore, shows that Mr. Khahiashvili could have been available to testify before this Court. The fact that petitioner *445 did not seek to have him do so suggests that Mr. Khahiashvili's testimony would not have been favorable to petitioner. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Finally, we note that the deposit made on December 18, 1984, was composed of cash in the amount of $ 7,200 and a check in the amount of $ 2,800. Petitioner has not explained the source of that check. The heart of petitioner's explanation is that his father came to the United States in April of 1985 with $ 60,000 in U.S. currency and that petitioner used the money to make five deposits totaling $ 50,000 into one account for petitioner's daughter, Ruth, and to make one deposit into another account for petitioner's son, Jacob. A significant difficulty with petitioner's explanation is the fact that there is nothing in the record to document the date on which petitioner's father arrived in this country or the date on which he returned to Israel. Petitioner testified that his father was here on April 12, 1985, and stayed for approximately 3 weeks. In his deposition, petitioner's father states that he visited the United *446 States "in 1985 for 2 months". Petitioner's father acknowledges that this was one of only two visits he made to this country but states that he does not remember the dates of his arrival or departure, the name of the airline, or the flight number. Petitioner was given an opportunity to submit a certified copy of Mr. Jacob Khotoveli's passport after trial, but he did not do so. Instead, petitioner submitted copies of the passports of Ruth Khotoveli and Eteri Masonashvili for the purpose of proving the date on which Mr. Jacob Khotoveli entered the United States. There is no foundation for the receipt of these documents into evidence, and respondent's Motion In Limine Regarding Admissibility Of Passport Of Ruth Khotoveli and Eteri Masonashvili will be granted. The only independent evidence that Mr. Jacob Khotoveli was present in the United States is the testimony of the employee of Flatbush Savings and Loan Association, discussed above. She stated that petitioner's father was present in the bank on December 18, 1984, and on April 12, 1985, when two of the savings accounts were opened. The problem with that testimony is that petitioner claims that it was Mr. Khahiashvili who brought *447 $ 10,000 of his father's money to open the first account on December 18, 1984, and that his father did not arrive until 1985. As stated above, if petitioner's father was in the United States on December 18, 1984, then this explanation does not make sense. There are a number of other unanswered questions raised by petitioner's explanation. First, petitioner does not explain where he or his father obtained the checks which were deposited into the subject accounts. The record shows that one of the checks, a check for $ 9,000 which formed a part of the deposit on April 16, 1985, was obtained from Anchor Savings Bank in return for $ 7,400 in currency and the withdrawal of $ 1,600 from petitioner's account at the bank. The latter funds had been deposited into the account on February 6, 1985, before petitioner's father allegedly came to the United States. It is evident, therefore, that petitioner's father did not supply $ 1,600 of the deposit made on April 16, 1985, and, to that extent, it is evident that petitioner's explanation is incorrect or incomplete. Second, it appears that petitioner's father departed from the United States before all of the subject deposits were made and *448 before the third account, number 970, was opened. If the elder Khotoveli's stay in the United States lasted for "three weeks" as petitioner testified, then he would have departed at the end of April 1985, before the deposits dated May 3, 1985, June 4, 1985, June 28, 1985, and July 10, 1985. If the elder Khotoveli's stay in the United States lasted for "two months" as he stated in his deposition, then he would have departed on or about June 12, 1985, before the deposits on June 28, 1985, and July 10, 1985. This discrepancy does not disprove petitioner's explanation, but it raises the question why petitioner's father would have left the United States without having deposited all of the money he allegedly brought with him. In the final analysis, petitioner's explanation leaves too many discrepancies unresolved. Questions of this nature are compounded by a statement contained in petitioner's Reply Regarding Admissibility of Passports of Ruth Khotoveli and Eteri Masonashvili that petitioner's father accompanied his daughter Eteri and his granddaughter Ruth when they "came to the US on 3-21-85". If that is true, then petitioner's father waited more than 3 weeks before he deposited *449 any of the cash he allegedly brought with him to the United States and he departed before the cash was fully deposited. Third, it appears that petitioner's daughter, Ruth, lives in Israel. We do not understand why petitioner's father would have brought $ 50,000 to the United States as a gift for her when she lives in Israel. Similarly, we do not understand why it was necessary to open a second account for petitioner's son, Jacob. Finally, we are skeptical that petitioner's father would have traveled to this country with such a large amount of U.S. currency. Based upon the above, we hold that petitioner has failed to prove that his father was the source of the $ 70,000 which was deposited into the subject three accounts at Flatbush Savings and Loan Association during 1984 and 1985. Accordingly, we sustain respondent's determination of deficiencies in petitioner's taxable income for those years. Before turning to the next issue, we must address one point raised by petitioner in his post-trial brief. Petitioner argues that respondent erred in computing petitioner's income using the bank deposits method described above. As the basis for that argument, petitioner's brief states: *450 Petitioner testified that for 1984 and 1985 he kept receipts, customer's checks, bills for groceries and produce and daily entry books for income and expenses and that all this information was turned over to Agent Joseph Jordan (Record 52) in connection with an audit of the restaurant. Being in possession of such information, the respondent had the basis to determine the income petitioner derived from the restaurant without resorting to a bank deposits method. Further, it would appear that respondent has available at its disposal more accurate methods of determining restaurant income than it used in this case. Thus, petitioner appears to contend that respondent's determination violates section 446(a) in that the Commissioner failed to use "the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books", as required by that section. We reject this contention because petitioner failed to prove that Primorski Restaurant, Inc. kept any books and records or that they were made available to respondent's agent. Every person liable for any tax must maintain books and records sufficient to establish the amount of his or her gross *451 income. Sec. 6001; Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Respondent's agent testified that he received no such records. Moreover, petitioner failed to call his bookkeeper, Mr. Wapnick, to testify at trial that the restaurant's books and records were given to respondent's books and records were given to respondent's agent or that the restaurant could not have been the source of the subject deposits. In these circumstances, we infer that Mr. Wapnick's testimony would not have been favorable to petitioner. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165. 2. Whether the underpayment for 1984 or 1985 is due to fraud. Respondent determined that the underpayment in each of the 2 years in issue, which was brought about by petitioner's failure to report the subject deposits as income, was due to fraud. As to this issue, respondent has the burden of proving fraud by clear and convincing evidence. Rule 142(b). Respondent points to the following facts as proof of petitioner's fraudulent intent: (1) Petitioner "fabricated" the explanation that his father was *452 the source of the subject deposits; (2) petitioner testified that he filed corporate returns for Primorski Restaurant, Inc.,whereas, in fact, no returns were filed on behalf of that corporation for its fiscal years ending 1984, 1985, and 1986; (3) Primorski Restaurant, Inc. did not keep books and records, or provide them to respondent's agent; (4) Primorski Restaurant, Inc. did not have any bank accounts and it conducted its business in cash; (5) Primorski Restaurant, Inc. filed employer's tax returns on Forms 940 and 941 which were obviously erroneous; (6) petitioner filed New York sales tax returns which are obviously erroneous; (7) petitioner incorrectly claimed "married filing joint return" on his 1982 and 1983 income tax returns when, in fact, he was not married; and, (8) petitioner structured the subject deposits to avoid filing currency transaction reports, pursuant to 31 C.F.R. sec. 103.22 (1991). We find that respondent has failed to prove that any portion of the underpayment in this case is attributable to petitioner's fraud. First, we cannot find that petitioner fabricated the explanation that his father was the source of the subject deposits and use that finding as evidence *453 of fraud. We agree that petitioner failed to prove his explanation, but we are not prepared to go further and find that the explanation is a fabrication. Similarly, we are not prepared to use, as evidence of petitioner's fraud, the fact that no currency transaction reports were filed by petitioner's father. In evaluating respondent's position that petitioner intentionally understated his Federal income tax for 1984 and 1985, based upon the other factors enumerated above, we have taken into account the fact that petitioner came to this country in 1981. While it appears that he speaks some English, it is clear that he is not fully conversant in our language. It is also clear that he does not adequately comprehend the reporting requirements imposed by Federal and State tax laws. It appears that petitioner took the prudent step of retaining an adviser to assist him in fulfilling his tax reporting responsibilities for Primorski Restaurant, Inc. For example, petitioner was asked on direct, "would your salary be contained on the tax returns that were introduced into evidence as joint exhibits for 1984 and 1985?" He stated that his "bookkeeper did everything". Petitioner testified *454 that he gave his bookkeeper all of his records and, on a number of occasions, stated that the bookkeeper would be able to supply the information requested. During his testimony, petitioner made repeated references to his bookkeeper. Petitioner's testimony was given credence by respondent's agent who testified that, during his audit of Primorski Restaurant, Inc., he dealt with a representative, Mr. Harold Wapnick. Petitioner's post-trial brief states that Mr. Wapnick is the bookkeeper to whom petitioner referred in his testimony. In any event, respondent did not call Mr. Wapnick as a witness in the Government's case or explain why Mr. Wapnick was not called as a witness. Therefore, respondent's proof in this case does not foreclose the possibility, suggested by petitioner's testimony, that petitioner left the preparation and filing of Federal and State tax returns to Mr. Wapnick. As long as that possibility remains, we cannot infer based upon the errors noted by respondent in petitioner's and Primorski's Federal and State tax returns that petitioner fraudulently intended to understate his Federal income tax for 1984 and 1985. 3. Whether there is a substantial understatement *455 of income tax under section 6661 for 1985. Respondent determined that there is a substantial understatement of income tax for 1985, and added to the tax for that year an addition under section 6661 in the amount of 25 percent of the underpayment attributable to such understatement, $ 4,606 (i.e., $ 18,424 x 25%). Petitioner's entire argument concerning this point is as follows: 7. There is reasonable cause for any understatement of tax and the taxpayer acted in good faith; no addition to tax under sec. 6661 is imposed. Petitioner is not a sophisticated taxpayer, speaks very little English and is not familiar with income tax rules and regulations. Upon all the facts and circumstances present in this case there is reasonable cause [sic] for any understatement to tax, that the petitioner acted in good faith; the respondent should waive the addition to tax under sec. 6661. Thus, petitioner argues that respondent should have waived the addition, pursuant to the Commissioner's authority under section 6661(c), and he asks us to review respondent's failure to do so. We will review the Commissioner's failure to waive the section 6661 addition, but our standard of review is whether *456 the Commissioner abused her discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). Accordingly, we will not substitute our judgment for hers, unless the taxpayer proves that the Commissioner acted arbitrarily, capriciously, or without sound basis in fact. Mailman v. Commissioner, supra at 1084. In this case, as quoted above, petitioner argues that he is "not a sophisticated taxpayer, speaks very little English and is not familiar with income tax rules and regulations". We might agree that those are facts which the Commissioner should consider in exercising discretion under section 6661(c). See sec. 1.6661-6(b), Income Tax Regs. However, those facts, standing alone, do not establish in this case that respondent's refusal to waive the addition was arbitrary, capricious, or without a sound basis in fact. Therefore, petitioner has not shown that respondent abused her discretion by failing to waive the addition under section 6661. 4. Whether petitioner is eligible to compute his tax for 1985 using income averaging. The final issue is whether petitioner is eligible in 1985 for the limitation on tax for "averageable *457 income", pursuant to section 1301. Petitioner's amended trial memorandum lists this as one of the issues in this case, as follows: Should income averaging be used for tax year 1985 in the event that an increased deficiency results in this case? Nevertheless, petitioner failed to make any mention of this issue in either of his two post-trial briefs. Accordingly, we conclude that petitioner has conceded or waived this issue, and we do not consider it. E.g., Rule 151(e)(5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Ideal Basic Industries, Inc. v. Commissioner, 82 T.C. 352, 396 (1984). To reflect the foregoing, Decision will be entered under Rule 155.